# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

LYNN SANSOUCIE,                    )
                                   )
        Plaintiff,                 )        C.A. No.  04-861-JJF
                                   )
              v.                   )        JURY TRIAL DEMANDED
                                   )
REPRODUCTIVE ASSOCIATES            )
OF DELAWARE, P.A.,                 )
                                   )
        Defendant.                 )


**DEFENDANT REPRODUCTIVE ASSOCIATES OF DELAWARE, P.A.'S
ANSWERING BRIEF IN OPPOSITION TO
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**


David H. Williams (#616)
Jennifer L. Brierley (#4075)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900
dwilliams@morrisjames.com
Attorneys for Defendant
    Reproductive Associates of Delaware, P.A.


Dated:  March 14, 2005

## TABLE OF CONTENTS

<u>PAGE</u>

TABLE OF AUTHORITIES ........................................................................................iii

NATURE AND STAGE OF THE PROCEEDINGS .....................................................1

SUMMARY OF ARGUMENT .....................................................................................3

STATEMENT OF FACTS ............................................................................................4

ARGUMENT..................................................................................................................5

    I.      BECAUSE PLAINTIFF FAILS TO IDENTIFY PORTIONS
           OF THE RECORD DEMONSTRATING THE ABSENCE OF A
           GENUINE ISSUE OF MATERIAL FACT, AN AWARD OF
           SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR WOULD
           BE IMPROPER ...........................................................................5

    II.     PLAINTIFF CONCEDES SHE WAS PAID ON A SALARY
           BASIS THEREFORE SUSTAINING AN ELEMENT OF
           THE PROFESSIONAL EMPLOYEE EXEMPTION ..............................6

    III.    REGARDLESS OF JOB TITLE, THE WORK PLAINTIFF
           PERFORMED AT RAD REQUIRED ADVANCED KNOWLEDGE
           IN A FIELD OF SCIENCE AND THE EXERCISE OF
           INDEPENDENT JUDGMENT AND DISCRETION.
           PLAINTIFF IS THEREFORE AN EXEMPT, PROFESSIONAL
           EMPLOYEE UNDER THE FLSA, AND SUMMARY JUDGMENT
           IN PLAINTIFF'S FAVOR IS IMPROPER..........................................7

           A.     Plaintiff Concedes The Work She Performed At RAD
                    Was Predominantly Intellectual And Varied In Its
                    Character Sustaining An Element Of The
                    Professional Employee Exemption ...............................................8

           B.     Plaintiff Admits The Work She Performed At RAD
                     Required Her To Exercise Independent Judgment
                    And Discretion, Including The Sperm Analysis She
                    Performed Regularly For Patients, Endocrine Assays,
                    Sperm Preparation, Phlebotomy, Assessment For Egg
                    Maturity And Fertilization, As Well As Embryo Grading,
                    And Embryo Freezing.................................................................8

i

      C.     Plaintiff's Work Handling Eggs, Sperm, And Human Embryos Compelled Plaintiff To Have Knowledge Of An Advanced Type In A Field Of Science .......................................12

IV.    PLAINTIFF MAKES AN OBVIOUS ATTEMPT TO DOWNPLAY HER ROLE AT RAD TO RECEIVE OVERTIME COMPENSATION, AND, IN DOING SO, PLAINTIFF CONTRADICTS HER OWN TESTIMONY, AND THE REPRESENTATIONS SHE MADE TO PROSPECTIVE EMPLOYEES IMMEDIATELY AFTER SHE LEFT RAD.........................................................................................14

V.    PLAINTIFF'S CLAIM FOR OVERTIME COMPENSATION UNDER THE DELAWARE WAGE PAYMENT AND COLLECTION ACT IS BARRED BY THE ONE YEAR STATUTE OF LIMITATIONS, AND PLAINTIFF IS NOT ENTITLED TO OVERTIME COMPENSATION BECAUSE SHE WAS EMPLOYED IN AN EXEMPT PROFESSIONAL CAPACITY.........................................................................................16

CONCLUSION.................................................................................................18

# TABLE OF AUTHORITIES

**PAGE**

## Cases

*Chelates Corp. v. Catrett,*
477 U.S. 317, 91 L.Ed.2d 265, 106 S. Ct. 2548 (1986)..................................................5

*Compass v. American Mirrex Corp.,*
72 F.Supp.2d 462 (D. Del. 1999)......................................................................................16

*Doherty v. Center for Assisted Reproduction, P.A.,*
108 F.Supp.2d 672 (N.D. Texas 2000)
*aff'd by* 264 F.3d 1140 (5th Cir. 2001) ....................................................................12, 15

*Hasken v. City of Louisivlle,*
234 F.Supp.2d 688 (W.D. Ky. 2002) .............................................................................16

*Knight v. Columbus*
19 F.3d 579 (11th Cir. 1994) ........................................................................................16

*Medical Response of Colorado, Inc.,*
937 F. Supp. 1477 (D. Colo. 1996)................................................................................16

*Muhammad v. New Castle County Vocational*
*Tech. Sch. Dist.,*
C.A. No. 95-235-SLR, Robinson, Jr.
(D. Del. May 2, 1996) Mem. Op. at 7............................................................................5

*Robertson v. Allied Signal, Inc.,*
914 F.2d 360 (3d Cir. 1990).............................................................................................5

*Rutlin v. Prime Succession, Inc.*
220 F.3d 737 (6th Cir. 2000) .......................................................................................13

*Schoch v. Firt Fidelity Bancorporation,*
912 F.2d 654 (3d Cir. 1990)............................................................................................5

*Soca Industries v. Bracken,*
374 A.2d 263 (Del. Supr. 1977)....................................................................................16

## Statutes and Other Authorities

29 C.F.R. § 213(a)(1) ...................................................................................................1

29 C.F.R. § 541.118(a) ..................................................................................................6

29 C.F.R. § 541.301 ...............................................................................................7, 12

29 C.F.R. § 541.301(e)(1) ............................................................................................12

10 *Del. C.* § 8111 .......................................................................................................16

19 *Del. C.* § 1101 *et seq.* ...........................................................................................1

29 U.S.C. § 201 *et seq.* ................................................................................................1

29 U.S.C. § 207(a)(1) ....................................................................................................6

29 U.S.C. § 213(a)(1) ....................................................................................................6

Fed. R. Civ. P. 56(c) .....................................................................................................5

## Attachments

**Tab**

*Muhammad v. New Castle County Vocational
Tech. Sch. Dist.,*
  C.A. No. 95-235-SLR, Robinson, Jr.
  (D. Del. May 2, 1996) Mem. Op. at 7 ..........................................................................A

## NATURE AND STAGE OF PROCEEDINGS

On July 14, 2004, Lynn Sansoucie ("Plaintiff") filed a two-count Complaint against Defendant Reproductive Associates of Delaware, P.A. ("RAD") alleging claims for unpaid overtime compensation under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.,*("FLSA") and the Delaware Wage Payment and Collection Act. 19 *Del. C.* § 1101, *et seq.* Plaintiff claims she is entitled to overtime compensation for hours she worked in excess of forty hours a week during her employment with RAD. Plaintiff also seeks attorney's fees and costs, as well as liquidated damages.

On February 14, 2005, RAD and Plaintiff filed cross motions for summary judgment on both of Plaintiff's claims.

RAD seeks summary judgment on the basis Plaintiff is exempt from the FLSA's overtime compensation requirement because she was employed by RAD in a bona fide professional capacity pursuant to 29 C.F.R. § 213(a)(1).[1] RAD also contends Plaintiff's claim under the Delaware Wage Payment and Collection Act is barred by the one year statute of limitations, and Plaintiff is not entitled to overtime compensation because she was employed in a bona fide professional capacity.

Plaintiff seeks summary judgment on the basis Plaintiff is not exempt from the FLSA's overtime compensation requirement. Relying on conclusory statements throughout her Opening Brief, Plaintiff makes an obvious attempt to downplay her role at RAD to establish an entitlement to overtime compensation. Plaintiff falls short of

---

[1] On April 20, 2004, the U.S. Department of Labor released new regulations redefining some of the exemptions for professional employees. Plaintiff's suit was initiated on July 14, 2004, but the revised regulations did not take effect until August 23, 2004. Any references to the FLSA's regulations in this Answering Brief refer to the regulations in effect when Plaintiff filed her suit.

establishing the absence of a genuine issue of material fact in her favor.   For all the reasons stated in RAD's Opening Brief in Support of its Motion for Summary Judgment, it is RAD, and not Plaintiff, who is entitled to an award of summary judgment.

This is RAD's Answering Brief in Opposition to Plaintiff's Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

I.     BECAUSE PLAINTIFF FAILS TO IDENTIFY PORTIONS OF THE RECORD DEMONSTRATING THE ABSENCE OF A GENUINE ISSUE OF MATERIAL FACT, AN AWARD OF SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR WOULD BE IMPROPER.

II.    PLAINTIFF CONCEDES SHE WAS PAID ON A SALARY BASIS THEREFORE SUSTAINING AN ELEMENT OF THE PROFESSIONAL EMPLOYEE EXEMPTION.

III.   REGARDLESS OF PLAINTIFF'S JOB TITLE, PLAINTIFF'S WORK AT RAD REQUIRED ADVANCED KNOWLEDGE IN A FIELD OF SCIENCE AND THE EXERCISE OF  INDEPENDENT JUDGMENT AND DISCRETION. PLAINTIFF IS THEREFORE AN EXEMPT, PROFESSIONAL EMPLOYEE UNDER THE FLSA, AND SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR IS INAPPROPRIATE.

   A.    Plaintiff Concedes The Work She Performed At RAD Was Predominantly Intellectual and Varied In Its Character Sustaining An Element of the Professional Employee Exemption.

   B.    Plaintiff Admits The Work She Performed At RAD Required Her To Exercise Independent Judgment And Discretion, Including The Sperm Analysis She Performed Regularly For Patients, As Well As Endocrine Assays, Sperm Preparation, Phlebotomy, Assessment For Egg Maturity And Fertilization, Embryo Grading, And Embryo Freezing.

   C.    Plaintiff's Work Handling Eggs, Sperm, And Human Embryos Compelled Plaintiff to Have Knowledge Of An Advanced Type In A Field of Science.

IV.    PLAINTIFF MAKES AN OBVIOUS ATTEMPT TO DOWNPLAY HER ROLE AT RAD TO RECEIVE OVERTIME COMPENSATION, AND IN DOING SO, PLAINTIFF CONTRADICTS HER OWN TESTIMONY, AND THE REPRESENTATIONS SHE MADE TO PROSPECTIVE EMPLOYERS IMMEDIATELY AFTER SHE LEFT RAD.

V.     PLAINTIFF'S CLAIM FOR OVERTIME COMPENSATION UNDER THE DELAWARE WAGE PAYMENT AND COLLECTION ACT IS BARRED BY THE ONE YEAR STATUTE OF LIMITATIONS, AND PLAINTIFF IS NOT ENTITLED TO OVERTIME COMPENSATION BECAUSE SHE WAS EMPLOYED IN AN EXEMPT PROFESSIONAL CAPACITY.

## STATEMENT OF FACTS

RAD incorporates by reference the detailed statement of facts contained in its Opening Brief filed on February 14, 2005 in support of its Motion for Summary Judgment.

## ARGUMENT

I.  **BECAUSE PLAINTIFF FAILS TO IDENTIFY PORTIONS OF THE RECORD DEMONSTRATING THE ABSENCE OF A GENUINE ISSUE OF MATERIAL FACT, AN AWARD OF SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR WOULD BE IMPROPER.**

A party is entitled to summary judgment only when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). See also, *Chelates Corp. v. Catrett,* 477 U.S. 317, 322-323, 91 L.Ed.2d 265, 106 S. Ct. 2548 (1986). As the moving party, it is Plaintiff's burden to inform the Court of the basis for her motion, and to identify those portions of the record which she believes demonstrate the absence of a genuine issue of material fact. *Muhammad v. New Castle County Vocational Tech. Sch. Dist.*, C.A. No. 95-235-SLR, Robinson, J. (D. Del. May 2, 1996) Mem. Op. at 7 (Attachment "A"). Plaintiff must identify specific portions of the record, and reliance on mere conclusory allegations is insufficient. *See Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 (3d Cir. 1990).

In this case, Plaintiff falls drastically short of meeting her burden to establish an entitlement to summary judgment. As an initial matter, Plaintiff fails to identify specific portions of the record demonstrating the absence of a genuine issue of material fact. In addition, Plaintiff makes several statements in her Opening Brief which are not supported by the evidentiary record, or by an affidavit from Plaintiff. Plaintiff did not take the deposition of any of RAD's employees, including her supervisors, Marc Portmann ("Portmann") and Ronald Feinberg, M.D. ("Feinberg"). Plaintiff's entire

5

Motion for Summary Judgment centers upon the conclusory argument she was not really a full-time embryologist at RAD, but was only training to some day be one. On several levels, Plaintiff's argument fails, and contradicts her own deposition testimony, as well as the representations she made to her prospective employers immediately after she left RAD.

## II.    PLAINTIFF CONCEDES SHE WAS PAID ON A SALARY BASIS THEREFORE SUSTAINING AN ELEMENT OF THE PROFESSIONAL EMPLOYEE EXEMPTION.

Under the Fair Labor Standards Act, employees are entitled to overtime compensation at the rate of one half times the regular rate for the time they work in excess of forty hours a week. 29 U.S.C. § 207(a)(1). The FLSA, however, exempts from the overtime requirement employees who are paid on a "salary basis" at a rate of not less than $250 a week and who are employed in a "bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1).

According to the FLSA's regulations, an employee is paid on a "salary basis" if the employee is paid at a rate of not less than $250 a week, and the employee:

> "…regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked." 29 C.F.R. § 541.118(a).

Plaintiff admits she was paid on a salary basis during her full-time employment with RAD. Plaintiff was paid at the rate of at least $1,000 a week (B-37; B-82-83). Plaintiff received a starting annualized salary of $62,500 and was paid in equal monthly installments. (B-37). Plaintiff received at least one salary increase, and her

compensation was never reduced because of variations in the quality or quantity of the work she performed at RAD. (B-37; B-82-83). In her Opening Brief, Plaintiff concedes she was paid on a salary basis under the FLSA, and this element of the professional employee exemption is satisfied.    [Plaintiff's Open. Br., p. 9].

### III.    REGARDLESS OF PLAINTIFF'S JOB TITLE, PLAINTIFF'S WORK AT RAD REQUIRED ADVANCED KNOWLEDGE IN A FIELD OF SCIENCE AND THE EXERCISE OF INDEPENDENT JUDGMENT AND DISCRETION. PLAINTIFF IS THEREFORE AN EXEMPT, PROFESSIONAL EMPLOYEE UNDER THE FLSA, AND SUMMARY JUDGMENT IN PLAINTIFF'S FAVOR IS IMPROPER.

Under the FLSA, a person is employed in a bona fide professional capacity when three criteria are met, and the employee's primary duty consists of the performance of:

(1)    Work that is predominantly intellectual and varied in character (as opposed to routine mental, manual, mechanical, or physical work);

(2)    Work requiring the consistent exercise of discretion and judgment in its performance; and

(3)    Work requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine, mental, manual, or physical processes.

29 C.F.R. § 541.301. Plaintiff contends there is no factual issue to dispute the conclusion Plaintiff was not employed in a bona fide professional category under the FLSA, and she is entitled to overtime compensation as a matter of law. The record evidence does not come close to supporting Plaintiff's contentions. Plaintiff relies on no more than

generalized and conclusory allegations in her Opening Brief, and she fails to identify portions of the record demonstrating the absence of an issue of material fact in her favor.

### A.    Plaintiff Concedes The Work She Performed At RAD Was Predominantly Intellectual and Varied In Its Character Sustaining An Element of the Professional Employee Exemption.

In her Opening Brief, Plaintiff concedes the work she performed at RAD handling human gametes and embryos was predominantly intellectual and varied in character, as opposed to routine mental, manual, mechanical, or physical work. [Plaintiff's Open. Brief, p. 9]. In fact, Plaintiff could not reasonably argue otherwise. Through Plaintiff's own testimony, she described the unique position she held in working delicately with eggs, sperm, and human embryos under laboratory conditions. By far, the record establishes there was nothing routine or mechanical about Plaintiff's work at all.

### B.    Plaintiff Admits The Work She Performed At RAD Required Her To Exercise Independent Judgment And Discretion, Including The Sperm Analysis She Performed Regularly For Patients, As Well As Endocrine Assays, Sperm Preparation, Phlebotomy, Assessment For Egg Maturity And Fertilization, Embryo Grading, And Embryo Freezing.

Plaintiff contends she did not perform work requiring the exercise independent judgment and discretion. To receive summary judgment, it is Plaintiff's burden to identify specific portions of the record showing the absence of a genuine issue of material fact in her favor. Plaintiff fails entirely to do so. In fact, Plaintiff's Opening Brief gives no description of the actual work Plaintiff performed at RAD in its Andrology, Endocrine, and IVF Labs. Plaintiff also fails to identify any of the specific testimony Plaintiff provided about her work at RAD handling sperm, eggs, and human embryos. Instead, in a summary and conclusory fashion, Plaintiff claims she did not

perform significant amounts of work at RAD requiring her to exercise independent judgment and discretion. The record indicates quite the contrary.    For example, according to Plaintiff's testimony, while employed at RAD, she:

- Evaluated the characteristics of different sperm samples; (B-22)

- Assessed when to dilute sperm samples for RAD's patients; (B-67)

- Identified sperm samples for patients; (B-22)

- Assessed the number of motile and non-motile sperm in a sample (B-61)

- Judged how much to "spin" patients' sperm samples (B-68-69)

- Assessed which blood draw tubes to use for endocrine tests; (B-63)

- Decided in what order to perform each endocrine test to achieve the most accurate results; (B-63)

- Evaluated what levels of blood to draw so each test could run appropriately for RAD's patients; (B-64)

- Assessed the appropriate draw site on RAD's patients; (B-62)

- Assessed whether a  patient's blood sample was ready to be tested or needed  additional time to clot; (B-64)

- Determined whether the data from endocrine testing was valid, or patients needed re-testing; (B-62)

- Compared and contrasted the quality control data for endocrine testing; (B-65-66)

9

- Assessed the maturity of patient eggs following an egg retrieval;
  (B-47-48)

- Injected sperm into the eggs of RAD's patients;
  (B-51)

- Evaluated whether patients' eggs had fertilized;
  (B-48-49)

- Assessed whether fertilization occurred normally or abnormally;
  (B-49)

- Graded patients' embryos to identify which were most suitable for
  transfer and which were not;
  (B-53-54)

- Assessed when to process embryos for thawing;
  (B-54; B-58)

- Communicated information to RAD's patients;
  (B-58-59)

By its very nature, Plaintiff's work compelled her to exercise independent thinking, analysis, judgment, and discretion. Plaintiff admitted it many times throughout her deposition. Among other things, when Plaintiff diluted sperm samples, she exercised independent judgment and discretion (B-67). When Plaintiff assessed how long to spin each sperm sample, she exercised judgment and discretion. (B-69). When Plaintiff assessed the differences between normally fertilized eggs and abnormal ones, she had to use her judgment and discretion (B-48-49). When Plaintiff graded embryos to decide which were most suited for patient transfers, she exercised judgment and discretion. (B-54). When Plaintiff decided when to process embryos for freezing, Plaintiff used discretion and judgment. (B-58).

In her Opening Brief, Plaintiff claims she was not really exercising independent judgments because she had to obtain "final approval" from Portmann, who

10

supervised her.    [Plaintiff's Open. Br., p. 9].    From a practical standpoint, given the involved nature of the laboratory work as Plaintiff describes it, Portmann would have to be consistently standing over Plaintiff's shoulder to give her "final approval" for all the judgments and decisions she made on a daily basis for the nearly three years she worked at RAD.  In fact, Plaintiff's own testimony causes her argument to fail.  Plaintiff admitted Portmann was not in RAD's  Laboratories with her all the time.  (B-35).  Plaintiff admitted Portmann had his own responsibilities in carrying out the IVF procedures for RAD's patients.  Plaintiff admitted she _and_ Portmann were needed to work in the IVF Lab together during a busy cycle at RAD because there was too much work for Portmann to handle alone.    (B-36).    Here, there is undisputed record evidence that two embryologists were required at RAD to verify the multiple steps in the IVF process, including labeling and identifying of the culture dishes, the "mating" of the right eggs with the right sperm, the optimal embryos to prepare for transfer to the patient's uterus, and the actual loading of the transfer catheter with the correct embryos prior to the physician carrying out the transfer.  (B-104).  Similar to attorneys practicing in a law firm together, Plaintiff admitted she and Portmann collaborated with each other about the various judgments they had to exercise. (B-55).

Plaintiff also contends in her Opening Brief, she was not employed in a professional capacity because "her superior overturned her judgment 65% of the time". [Plaintiff's Open. Br., p. 9].  As an initial matter, this statement is nowhere in the evidentiary record, nor has Plaintiff provided an affidavit to the Court attesting to its truth.  In addition, the record indicates this statement could not be true.  Plaintiff admitted Portmann was not always with her in RAD's Laboratories, and Plaintiff admitted

performing semen analysis, phlebotomy, endocrine assays, semen freezing, and sperm preparation independently of Portmann. (B-35-36). Plaintiff also admitted if she made a mistake in performing semen analysis, endocrine analysis, phlebotomy, and sperm preparation, her mistake would have an effect on the entire IVF process because "everything was kind of interrelated" and "intertwined". (B-29; B-83). Plaintiff's contention that her work did not involve independent and judgment and discretion cannot be sustained.

### C.     Plaintiff's Work Handling Eggs, Sperm, And Human Embryos Compelled Plaintiff to Have Knowledge Of An Advanced Type In A Field of Science.

Plaintiff's contention that her work did not involve independent judgment and discretion cannot be sustained. According to the FLSA's regulations, "knowledge of an advanced type" means knowledge which cannot be attained at the high school level. 29 C.F.R. 541.301(a). In addition, the regulations identify "various types of physical, chemical, and biological sciences, including pharmacy, and registered or certified medical technology" as professions which meet the requirement for a prolonged course of specialized intellectual instruction and study. 29 C.F.R. 541.301(e)(1).

In *Doherty v. Center for Assisted Reproduction, P.A.,* 108 F. Supp.2d 672 (N.D. Texas 2000), aff'd by 264 F.3d 1140 (5th Cir. 2001), the Court recognized embryologists, by the very nature of their responsibilities, engage in work of an advanced type in science.

In this case, the record evidence establishes Plaintiff's work at RAD had to require advanced knowledge in a field of science. No reasonable jury could conclude otherwise. Plaintiff admitted she completed nearly 60 credits of coursework in medical

technology at Hahnemann Medical College. (B-4; B-6; B-91; B-133-134). Plaintiff then completed additional coursework in medical technology at Rowan College. *Id.* Plaintiff also completed a laboratory certification program she completed at the School of Laboratory Science at Cherry Hill Medical Center. (B-133). Plaintiff obtained an Associate's of Science Degree in Medical Technology from Hahnemann Medical College in 1975, and is now only two credits short of completing her Bachelor of Science in Healthcare Administration. (B-6-7; B-93; B-108) [See also, Plaintiff's Open Br., p. 3]. To downplay her credentials, Plaintiff argues she did not have a Bachelor's degree when she worked at RAD. [Plaintiff's Open. Br., p. 9]. Plaintiff overlooks the fact the FLSA regulations <u>do not require</u> that an exempt professional employee hold a Bachelor's degree. *Rutlin v. Prime Succession, Inc.*, 220 F.3d 737 (6th Cir. 2000) [emphasis added.]

Plaintiff is a certified Medical Technologist, as well as a certified Medical Lab Technician, a Clinical Lab Technician, and also possesses her clinical lab practioner certification. (B-7-8; B-108; B-133; B-137-138) [Open Br. P. 3]. Well before Plaintiff even joined RAD, she considered herself a "senior medical technologist" as stated on the resume she gave to RAD. (B-5; B-107).

To achieve certification, Plaintiff testified she had to pass an exam administered by a Board of professionals assessing her skills and knowledge in the field of medical technology. (B-88-89). Plaintiff admitted the certification not only reflects her mastery of education in a specialized field, but also the breadth of her work experience in the laboratory sciences. (B-9-10). Similar to the legal profession, Plaintiff is required to complete a specific number of hours of continuing education every two years to maintain her certifications. (B-89-90). Indeed, Plaintiff's entire educational

background is specialized centering upon the laboratory sciences.  No reasonable jury could conclude otherwise.

IV.  **PLAINTIFF MAKES AN OBVIOUS ATTEMPT TO DOWNPLAY HER ROLE AT RAD TO RECEIVE OVERTIME COMPENSATION, AND IN DOING SO, PLAINTIFF CONTRADICTS HER OWN TESTIMONY, AND THE REPRESENTATIONS SHE MADE TO PROSPECTIVE EMPLOYERS IMMEDIATELY AFTER SHE LEFT RAD.**

Plaintiff claims, in her Opening Brief, she was "…hired with the intention that she would become an embryologist, however, during her employment she was not performing the tasks and duties of an embryologist." [Plaintiff's Open Br., p. 8].  This statement is completely contradictory to the detailed deposition testimony Plaintiff provided about the duties of an embryologist, and the work Plaintiff performed at RAD.  For example, Plaintiff admitted the work of an embryologist encompasses many things, including semen analysis, sperm preparation, micromanipulation (i.e., ICSI), identification of oocytes (i.e., eggs), freezing eggs and embryos, etc. (B-79-80; B-139-140).  In her deposition, Plaintiff admitted performing all of these duties and others at RAD.  (B-21-22; B-35-36; B-42-55; B-58-60; B-61-65; B-67).

Plaintiff's contention that she was not performing the work of an embryologist at RAD is a gross mischaracterization of the record.  Even before she started working at RAD as a full-time embryologist, Plaintiff worked at the Bryn Mawr Hospital IVF Center performing all andrology testing, semen analysis, sperm processing for the IVF cycle.  Plaintiff represented to RAD she was trained in all aspects of the IVF procedure at Bryn Mawr Hospital, including egg retrievals, egg finds, and embryo development.  (B-22-23; B-135).  In fact, the only IVF procedure Plaintiff reported she had not been trained in was the specialized ICSI procedure.  (B-22-23).

14

Without identifying any reference to the record, Plaintiff further claims she did not hold herself out to be an embryologist, but only claimed to be a medical technologist with 24 years of experience, when she applied to RAD for employment. [Plaintiff's Open. Br. P. 4].    The record indicates otherwise.  When Plaintiff sought a position with RAD, she described her extensive experience in a cover letter  pointing out she was not only a medical technologist, but also <u>proficient</u> in IVF procedures:

> I am a medical technologist with 24 years experience.  I am <u>proficient in andrology</u>, <u>IVF retrievals</u>, RIA, Hepatitis Testing, Immuassays, Viral Testing, Electrophoresis, Immunology, and Quality Control.  (B-8; B-106).

Plaintiff further claims, in her Opening Brief, she was employed by RAD as merely a medical technologist who was training to, someday become an embryologist. Yet, this is not what Plaintiff portrayed to potential employers.   In an obvious effort to secure overtime compensation, Plaintiff attempts to distinguish the work she performed at RAD with the representations she admittedly made to prospective employers when she left RAD.  On the resume she prepared when she left RAD, Plaintiff described herself as someone "fully trained" and "qualified" in virtually all aspects of assistive reproductive technology.    (B-70-71).   Plaintiff described the work she did at RAD as:   (a) all andrology testing; (2) *in vitro* fertilization; (3) embryo testing; (4) embryo freezing; (5) intra-cytoplasmic sperm injection ("ICSI"); (6) hatching of eggs by laser (i.e., assisted hatching); and (7) endocrine testing.  (B-71; B-135).  In fact, these are the very same tasks the embryologist in *Doherty v. Center for Assisted Reproduction, P.A., supra.* performed, and the Court ruled she was an exempt, professional employee under the FLSA.

In an effort to minimize her abilities and the significance of the work she performed at RAD, Plaintiff claims she was really still "gaining the skills to work as an embryologist in an IVF Lab" when she left RAD. [Plaintiff's Open. Br., p. 4]. This is an inaccurate reading of Plaintiff's testimony. Plaintiff testified she considered herself "a good embryologist" when she left RAD, and she in fact secured a full-time position as an embryologist with another IVF Lab immediately after she resigned from RAD. (B-34; B-72).

Overall, Plaintiff does not come close to establishing an entitlement to summary judgment on the basis of being non-exempt under the FLSA. Plaintiff's contradictions, standing alone, should preclude summary judgment in Plaintiff's favor.

## V.  PLAINTIFF'S CLAIM FOR OVERTIME COMPENSATION UNDER THE DELAWARE WAGE PAYMENT AND COLLECTION ACT IS BARRED BY THE ONE YEAR STATUTE OF LIMITATIONS, AND PLAINTIFF IS NOT ENTITLED TO OVERTIME COMPENSATION BECAUSE SHE WAS EMPLOYED IN AN EXEMPT PROFESSIONAL CAPACITY.

Plaintiff has not established an entitlement to summary judgment on her claim for overtime compensation allegedly earned from May 2001 through February 2004 under the Delaware Wage Payment and Collection Act. A one year statue of limitation applies to claims brought under the Delaware Wage Payment and Collection Act. *Soca Industries v. Bracken*, 374 A.2d 263 (Del. Supr. 1977); 10 Del. C. § 8111. A cause of action for overtime compensation accrues at each regular payday immediately following the work period during which services were rendered and for which the overtime compensation is claimed. *Hasken v. City of Louisville*, 234 F.Supp.2d 688 (W.D. Ky 2002); *Compass v. American Mirrex Corp.* 72 F. Supp.2d 462 (D. Del. 1999);

*Medical Response of Colorado, Inc.*, 937 F. Supp. 1477 (D. Colo. 1996); *Knight v. Columbus*, 19 F.3d 579 (11th Cir. 1994).

In this case, Plaintiff confirms she received a regular paycheck once a month during full-time employment at RAD (i.e., May 2001 to February 2004). (B-37; B-73-75; B-82-83; B-85-86). Plaintiff's cause of action therefore accrued each month she received her paycheck, and it did not contain the overtime she claims she was due. Plaintiff, however, did not initiate this lawsuit until July 14, 2004. Thus, any claim for overtime compensation under the Delaware Wage Payment and Collection Act accruing before July 2003 is time-barred. In addition, Plaintiff has not demonstrated an entitlement to overtime compensation because she was employed in a bona fide professional capacity when working at RAD.

## CONCLUSION

For all the foregoing reasons, RAD respectfully requests this Court deny Plaintiff's Motion for Summary Judgment.

Respectfully submitted,

David H. Williams (#616)
Jennifer L. Brierley (#4075)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900
dwilliams@morrisjames.com
Attorneys for Defendant Reproductive Associates of
Delaware, P.A.

Dated:  March 14, 2005

**TAB A**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOHN MUHAMMAD,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )    Civil Action No. 95-235-SLR
                                        )
NEW CASTLE COUNTY VOCATIONAL            )
TECHNICAL SCHOOL DISTRICT,              )
ADAM JABLONSKI, JOE DEARDORFF,          )
LEEROY DESHAZOR, WILLIAM                )
BURKHOLDER, JOHN MOYLE, ROW             )
KUSKA, MICHAEL SHOCKLEY,                )
DENNIS L. LOFTUS, THOMAS SHARP,         )      LIBRARY
JOHN LYNCH, TIM KAIN, STEVE             )
BURG, and JOSEPH F. MOZZANI,            )     MAY 1 3 1996
                                        )
            Defendants.                 )      M.J.H.W.
                                        )

--------------------------------------------------------------

Caroline P. Ayres, Esquire, Wilmington, Delaware, Counsel for
plaintiff.

David H. Williams, Esquire, and Paul P. Rooney, Esquire, of
Morris, James, Hitchens & Williams, Wilmington, Delaware, Counsel
for defendants.

--------------------------------------------------------------

MEMORANDUM OPINION

Dated: May   2   , 1996

Wilmington, Delaware

ROBINSON, District Judge

## I.    INTRODUCTION

Plaintiff John Muhammad, an African American male and former employee of the New Castle County Vocational School District ("the District"), brought this suit against the District and thirteen District employees.[1]  He claims that defendants harassed him, wrongfully disciplined him, subjected him to demeaning treatment, forced him to perform tasks not in keeping with his job description, refused to permit him the resources he needed to perform his job adequately, and eventually terminated his employment due to his race and in retaliation for a grievance he had filed previously.  Plaintiff claims violations of Title VII and 42 U.S.C. § 1981, and asserts pendent state claims of

---

1.  Defendant Adam Jablonski was plaintiff's immediate supervisor, who in turn was supervised by Defendant Tim Kain. Defendant Kain, who holds the position of Assistant Supervisor of Buildings and Grounds, is supervised by Defendant Thomas Sharp, the Director of Building and Grounds, who reports to Defendant Dennis Loftus, who is the District Superintendent.
      Defendant John Lynch is the President of the District Board of Education.  Defendant Joe Deardorff serves as Assistant Superintendent for the District.  Defendant Joseph Mozzani was employed until November 1993 as the District's Director of Personnel; defendant LeeRoy DeShazor is currently employed as the District's Personnel Director.  Defendant Michael Shockley is employed by the District in the capacity of Director of Business Services.  Defendant Steve Burg was employed by the District as Custodian Foreman until January 1995.  Defendant William Burkholder began his employment as Chief Custodian in November, 1994.
      Defendant John Moyle is the Principal and former Assistant Principal of Delcastle High School; defendant Reinhold Kuska is the current Assistant Principal at Delcastle.  Each of the individual defendants, with the exception of defendant Burkholder, held his current position for all or part of the period of plaintiff's employment by the District.  (D.I. 6 at 1-4)

breach of implied covenant of good faith and fair dealing, breach of employment contract, defamation, breach of contract for raises and promotions, and intentional and negligent infliction of emotional distress. He requests compensatory, punitive, and liquidated damages and extensive injunctive and declaratory relief.

Presently before the court is defendants' motion for summary judgment. This motion has been fully briefed and is ripe for decision. For the following reasons, defendants' motion will be granted.

## II.  BACKGROUND

Plaintiff was hired by the District as a custodian at the Delcastle High School on November 18, 1988. (D.I. 1 at ¶ 23) In August 1992, plaintiff applied for the open position of receiver at Delcastle.[2] After another candidate was hired for

---

2.  According to the collective bargaining agreement which covers custodial and maintenance employees of the District, a receiver's primary function is "[t]o receive, distribute and record all materials delivered to the building complex." (D.I. 46 at A-233) Receivers are also responsible for maintaining the building's fire extinguishers, keeping records of deliveries, moving furniture when necessary, and responding to custodial emergencies. In addition, the job description states that "[c]ustodial or maintenance duties will be assigned to meet the flexibility of the receiving schedule." (D.I. 46 at A-233) The record also contains a document entitled "Duties of Receiver, Delcastle," which plaintiff signed on August 10, 1993. (D.I. 45 at A-167(a)) That document specifically lists, inter alia, the following duties:

> receive and distribute materials and perform other task[s] as instructed by the Chief Custodian; . . . maintain and clean compound parking area; . . . [m]op floor, clean windows, and clean convection covers; . . . [c]lean Courtyard and cut grass as needed . . . .
> (continued...)

2

the position, plaintiff initiated a grievance with his union, which represented him in an arbitration proceeding before the American Arbitration Association. (D.I. 45 at A-167(a)(a)(a)(a)(a)(g))[3]  The arbitrator found that plaintiff was more qualified for the receiver position than the candidate the District had chosen, and that the District had improperly relied on the latter's mechanical engineering degree and facility with computers, which were not listed or necessary qualifications for the position.  The arbitrator ordered the District to promote plaintiff to the receiver position and awarded him back pay. (D.I. 45 at A-167(a)(a)(a)(a)(a)(r)-(t))

Plaintiff officially began his new position on August 2, 1993.  (D.I. 46 at A-234, Ex. A)  At the order of his supervisors, plaintiff continued to perform a variety of custodial tasks after his promotion to receiver.  These tasks included picking up trash, cleaning up when toilets overflowed, sweeping up school grounds, and removing rocks from the dirt outside the school.  (D.I. 46 at A-235-36)  On one occasion, plaintiff claims that he was forced to work outside in the rain without rain gear.  (D.I. 46 at A-236)  He also contends that he was assigned outdoor duties in very hot weather.  (D.I. 46 at A-

---

2.  (...continued)

For performing the extra duties of receiving and delivering materials, receivers are paid a premium of $.75 per hour over the custodial rate.  (D.I. 46 at C-19)

3.  Citations to pages in the appendices submitted by plaintiff are identified according to plaintiff's numbering system.

236)  Plaintiff was not given keys to the receiving room or classrooms and was not assigned a desk or a computer.  (D.I. 46 at A-235)   According to the affidavits of coworkers submitted by plaintiff, plaintiff was isolated from his coworkers and "[m]ore so than any other employee," was not permitted to speak with his coworkers.  (D.I. 46 at A-238)  Without stating specific grounds for their opinions, several coworkers who submitted affidavits on plaintiff's behalf have also expressed the view that plaintiff was treated differently from other receivers (D.I. 46 at A-238, A-242, A-243, A-244), and that defendants purposefully isolated plaintiff and assigned him to demeaning tasks because they had wanted a white person to have plaintiff's job.  (D.I. 46 at A-239, A-241, A-245, A-246)

Plaintiff states that he felt humiliated by the tasks assigned to him and by defendants' failure to issue him keys and a desk.  He also contends that on one occasion, unnamed "supervisors" mocked him and videotaped him from inside the school building while he worked outside in hot weather.  (D.I. 46 at A-236)  Plaintiff admits that none of the individual defendants ever used racial slurs in his presence (D.I. 45 at A-42), and does not allege that any defendant made any statements which would otherwise indicate racial animus or discriminatory intent, with one exception.  Plaintiff has submitted the affidavit of Gary David Moore, who worked as a receiver for the District at approximately the same time as plaintiff.  According to Mr. Moore, unnamed "county employees" joked about a racial

slur which defendant Sharp allegedly made in reference to plaintiff. (D.I. 46 at A-245)

The parties agree that at some point, the District eliminated the position of receiver. The circumstances of this change are not clear. Defendants assert that "the level of compensation for individuals who occupied such positions has not, however, been reduced." (D.I. 45 at A-30) Plaintiff has made no claims as to reduction of compensation following the elimination of the receiver position, but has submitted an affidavit from James Boyer, a former District receiver and union vice president, who asserts that a white male named Ray Johnson continued to perform the duties of a receiver after the position had been eliminated. (D.I. 46 at A-241)

In June 1994, plaintiff suffered a knee injury which caused him to be absent from work from June 1994 through June 1995. In September 1994, the District sent notice to plaintiff requesting medical documentation of his disability so that he could collect disability insurance. (D.I. 45 at A-167(a)(k),(l); A-167(2)) Plaintiff apparently did so, declaring that he would be ready to return to work in October. (D.I. 45 at A-167(a)(q)) Plaintiff has submitted other notes signed by Doctor Clemmer which indicate that plaintiff would not be able to return to work until January 4, 1995. (D.I. 46 at C-33) It is not clear whether these notes were ever submitted to the District.

Defendants claim that plaintiff indicated his intention to return to work in January 1995. The District informed

5

plaintiff that no positions were available at that time, but requested that he submit medical certification of his ability to return to work before March 1995 to avoid termination and preserve his eligibility for the next available position. According to defendants, plaintiff did not comply with this request.   The District then sent a notice to plaintiff's counsel of a termination hearing.   Plaintiff admits that neither he nor his counsel attended the hearing, which took place on June 5, 1995.   As a result, the District terminated plaintiff's employment for insubordination. (D.I. 6 at 10, D.I. 43 at A-236, A-239)   After carefully reviewing plaintiff's brief in opposition to defendants' motion and the approximately one thousand non-consecutively numbered documents submitted in support (many of which are repetitive or unidentifiable), the court is unable to ascertain what plaintiff's contentions are concerning the six month period immediately prior to his termination.

III.   DISCUSSION

Plaintiff contends that defendants singled him out for ill treatment, prevented him from performing his job properly, disciplined him without justification, eliminated the receiver position, and eventually terminated his employment because of his race and in retaliation for filing his grievance.   Defendants argue that plaintiff has offered no evidence of discriminatory or retaliatory motive.   They point out that plaintiff has conducted virtually no discovery in this case, and that in opposition to defendants' motion for summary judgment, plaintiff relies on

affidavits which are not based on the affiants' personal knowledge. Therefore, defendants' contend, plaintiff has failed to make out a prima facie case of discrimination.

A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to a summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. Where, as here, the nonmoving party opposing summary judgment has the burden of proof at trial on the issue for which summary judgment is sought, he must then make a showing sufficient to establish the existence of an element essential to his case. If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Moreover, the mere existence of some evidence in support of the nonmoving party will not be sufficient to support a denial of a motion for summary

judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that issue.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

## B.  Title VII Claims

Title 42 of the United States Code, Section 2000e-2, makes it unlawful for an employer "(1) to fail or refuse to hire . . . any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, . . . or (2) to limit, segregate or classify his employees or applicants for employment in any way that would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his stature as an employee, because of such individual's race . . . ."  In so-called "pretext" cases, such as the present case, the court must apply the following method of proof:

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason for the employee's rejection." ...  Third, should the defendant carry this burden, the plaintiff must then have the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

<u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 252-253, (1981), (citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802 (1973)).

Using this standard, the court will examine each of plaintiff's allegations in turn.

### 1. Failure to promote

Although not pleaded in the complaint, plaintiff appears to argue that the District's initial decision not to promote him to the receiver position was made with a discriminatory motive. Several of the affidavits and much of the documentary evidence plaintiff has submitted concern the events leading up to plaintiff's promotion, and plaintiff has repeatedly asserted that defendants did not promote him because they did not wish to have an African American hold the position of receiver. To the extent that plaintiff is attempting to recover for defendants' actions in initially denying him the position of receiver, the court declines to consider such a claim. Whatever wrongs plaintiff suffered during the application process were corrected by the arbitrator's order directing plaintiff's appointment to the receiver position with back pay. The court also notes that the arbitrator made no finding as to discriminatory motive in her opinion awarding plaintiff the position. (D.I. 45 at A-167(a)(a)(a)(a)(a)

### 2. Conditions of employment

Title VII protects employees from a "work environment abusive to employees because of their race, gender, religion, or national origin." Harris v. Forklift Systems, Inc., 510 U.S. 17 (1993). A pattern of harassment can constitute a violation of Title VII if it is severe enough "to alter the conditions of the

9

victim's employment and create an abusive working environment."
Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986).   The
Third Circuit has identified five elements necessary to prove a
hostile environment claim:

> (1) the plaintiff suffered intentional
> discrimination because of his or her
> membership in the protected class;
> (2) the discrimination was pervasive and
> regular;
> (3) the discrimination detrimentally affected
> the plaintiff;
> (4) the discrimination would have
> detrimentally affected a reasonable person of
> the same protected class in that position;
> and,
> (5) the existence of respondeat superior
> liability.

West v. Philadelphia Electric Co., 45 F.3d 744, 753 (3d Cir.
1995).  In this case, plaintiff has failed to make an adequate
showing on the first element, intentional discrimination.

Plaintiff contends that defendants assigned him to
menial custodial tasks in order to humiliate him.  However, the
official job descriptions for the position of receiver explicitly
state that custodial work, including outdoor tasks, constitutes
part of the receiver's duties.  None of the treatment plaintiff
claims to have received is inherently racist or retaliatory.
Plaintiff does not assert that white receivers were treated
differently in this regard, nor does he offer any evidence
connecting the tasks he was assigned to a retaliatory motive on
the part of defendants.

In addition to his own affidavit, plaintiff has also
submitted affidavits from several of his coworkers and union

representatives in an attempt to establish intentional discrimination as the reason for his treatment.[4]  Gary David Moore, who also worked as a receiver for the District, states in his affidavit:

> County employees would joke about Mr. Tom Sharp's statement that he would not let a "nigger" get the receiver position with the County, as long as he was in charge.  Based upon Mr. Sharp's statement,, and other County actions, I believe that Mr. Muhammad was terminated from the receiver position because he was black.

(D.I. 46 at A-245)  Neither Mr. Moore nor plaintiff has named the "county employees" who allegedly made these jokes, nor does the affiant claim to have heard the racial slurs himself.  Mr. Moore's statement would be inadmissible at trial as hearsay.

Those affidavits which assert that plaintiff was treated differently from his coworkers fail to identify the individuals who were treated differently.  They provide no clues to the positions these individuals held, or whether they were in fact similarly situated.  Assuming that every assertion contained in these affidavits is true, the most the court can conclude is that each affiant sincerely believes that plaintiff was discriminated against because of his race and/or in retaliation

---

4.  Defendants argue that the court should not consider the affidavits submitted by plaintiff because he failed to disclose their contents in response to defendants' discovery requests.  Although plaintiff's responses to interrogatories do not appear to fully reflect the content of the affidavits, defendants have not been prejudiced by plaintiff's actions.  Defendants deposed each of the witnesses in question.  Furthermore, as explained more fully below, the evidence presented in the affidavits is not sufficient to withstand summary judgment.

11

for filing a grievance. "Affidavits based on information and belief . . . are disregarded under Federal Rule of Civil Procedure 56." Mechell v. Brandywine School District, et al., CA No. 90-125-JRR at 43 (D. Del. May 10, 1991), citing Automatic Radio Mfg. Co. v. Hazeltine Research, 339 U.S. 827, 831 (1950). In Mechell, as in this case, plaintiff relied "almost exclusively" on affidavits "not based on personal knowledge." Mechell at 41.

Aside from a single mention of a racist remark attributed to defendant Sharp, which if offered in trial would be inadmissible as hearsay, none of the affiants state any grounds for their belief that race played a role in defendants' treatment of plaintiff.   Therefore, the court concludes that plaintiff cannot meet his burden of establishing, as a prima facie matter, that defendants discriminated against him on the basis of race.

### 3.  Elimination of plaintiff's position

Plaintiff argues that because defendants had determined not to allow an African American person to hold the position of receiver, they simply eliminated the position.   Defendants do not deny that the position was eliminated, but state that plaintiff's compensation was not reduced as a result of this change. Plaintiff has failed to allege any injury resulting from this change.   The only evidence that plaintiff presents to indicate that this decision was motivated by race is the affidavit of James Boyer, who states that "[i]t is my belief that Mr. Johnson [a white man] still performed as a receiver for New Castle County

12

even after Mr. Muhammad's and my position were terminated."
(D.I. 46 at A-241) (emphasis added).  Mr. Boyer has made no
representations as to the reason for this belief, nor has
plaintiff offered any corroboration.  As discussed fully above,
the court cannot accept assertions based on mere opinion,
especially where the affiant does not even articulate the basis
for that opinion.  The court concludes, therefore, that plaintiff
has failed to make any showing that race was a motivating factor
in the District's decision to do away with the position of
receiver.

   4.  Termination of plaintiff's employment

  "The burden of establishing a prima facie case of
disparate treatment is not onerous."  <u>Burdine</u>, 450 U.S. at 253.
A plaintiff who claims that his employer fired him in violation
of Title VII makes out a prima facie claim under 42 U.S.C.
§2000e-2 by showing 1) that he is a member of a protected class;
2) that he is qualified for the position in question; 3) that he
was fired from that position; and 4) that the employer treated
other individuals outside the protected class more favorably.
<u>Waldron v. SL Industries, Inc.</u>, 56 F.3d 491, 494 (3d Cir. 1995),
<u>citing</u> <u>Burdine</u>, 450 U.S. at 253; <u>Josey v. John R. Hollingsworth</u>
<u>Corp.</u>, 996 F.2d 632, 638 (3d Cir. 1993).  This standard "is not
inflexible, as '[t]he facts necessarily will vary in Title VII
cases, and the specification above of the prima facie proof
required from respondent is not necessarily applicable in every
respect in differing factual situations.'"  <u>Burdine</u>, 450 U.S. at

253, n. 6, quoting McDonnell Douglas, 411 U.S. at 802. Plaintiff does, however, have the burden of establishing, as a prima facie matter, "circumstances that give rise to an inference of unlawful discrimination." Waldron, 56 F.3d at 494, quoting Burdine, 450 U.S. at 253.

The parties do not dispute that plaintiff is a member of a protected class, that he was qualified for the position of receiver, and that the District terminated his employment.[5] The only issue, then, is whether plaintiff has made a sufficient showing that non-African American employees who were similarly situated to plaintiff were treated more favorably. The affidavits and documentary evidence plaintiff has offered present no such evidence. In its absence, plaintiff has no grounds for his claim of discriminatory firing. The court, therefore, will grant summary judgment for defendants on this claim.

### 5. Retaliation claim

The court is unable to determine with any certainty whether plaintiff is attempting to pursue a claim of retaliation. Although neither his complaint nor his brief make any clear mention of retaliation, much of the evidence submitted to the court by plaintiff appears geared toward establishing retaliatory intent on the part of defendants. The court will proceed under

---

5. Although defendants do not argue that plaintiff was not qualified for his position, the court notes that an employee who fails to perform his job properly, including failure to show up for work, could be considered not qualified. Alston v. Rice, 825 F. Supp. 650, 655-56 (D. Del. 1993).

the assumption that plaintiff does wish to pursue a retaliation claim.

Title VII makes it unlawful "to discriminate against any . . . employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this title . . . or because he has made a charge, testified, assisted, participated in any manner in an investigation, proceeding, or hearing under this title . . . ." 42 U.S.C. § 20003-3. To establish retaliation under Title VII, plaintiff must show that:

> (1) [he] engaged in activity protected by Title VII;
> (2) the employer took an adverse employment action against [him]; and
> (3) there was a causal connection between [his] participation in the protected activity and the adverse employment action.

Nelson v. Upsala College, 51 F.3d 383, 386 (3d Cir. 1995). Defendants claim that plaintiff's filing of a grievance under the terms of a collective bargaining agreement was not a protected activity under Title VII. The court agrees. According to the arbitrator's opinion and award, plaintiff's grievance concerned the District's failure to adhere to the seniority rules outlined in the collective bargaining agreement. Discrimination was never mentioned in the opinion, and no findings were made on the issue. (D.I. 45 at 167 (a)(a)(a)(a)(a)(g) et seq.) Because the grievance procedure did "not relate to any claim of discrimination covered by Title VII," Alston v. Rice, 825 F. Supp. 650, 657 (D. Del. 1993), plaintiff's utilization of that

procedure is not a protected activity under Title VII.  Summary judgment in favor of defendants on this claim, therefore, is appropriate.

### C.  Section 1981 Claim

Plaintiff has also asserted a claim under 42 U.S.C. § 1981, which prohibits racial discrimination in contractual relationships.  The proof required to establish a claim under § 1981 is identical to that required for a Title VII claim. Roebuck v. Drexel University, 852 F.2d 715, 726 (3d Cir. 1988). Because, as discussed above, plaintiff has failed to establish a prima facie case on his Title VII claim, the court will grant summary judgment for defendants on the § 1981 claim as well.

### D.  Pendent State Claims

The court's subject matter jurisdiction in this case depends on the existence of a federal question.  28 U.S.C. §§ 1331, 1343.  Because the court will grant summary judgment on both of plaintiff's federal claims, and there is no diversity among the parties, the court no longer has pendent jurisdiction over plaintiff's state law claims.  They must be dismissed for lack of jurisdiction.  Therefore, it is unnecessary for the court to consider the parties' arguments on the merits of these claims.

## IV.  CONCLUSION

For the reasons stated above, the court will grant summary judgment in favor of defendants on all claims.  An order consistent with this memorandum opinion shall issue.

## CERTIFICATE OF SERVICE

I, JENNIFER L. BRIERLEY, hereby certify that on this 14th day of February, 2005, two copies of the within **DEFENDANT REPRODUCTIVE ASSOCIATES OF DELAWARE, P.A.'S OPENING BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** were served by United States Mail, postage prepaid, on the following attorney of record at the address indicated below:

Jeffrey K. Martin, Esquire
Margolis & Edelstein
1509 Gilpin Avenue
Wilmington, DE  19806


Jennifer L. Brierley

DHW/016459-0003/1025219/1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| LYNN SANSOUCIE, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No.  04-861-JJF |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| REPRODUCTIVE ASSOCIATES | ) | |
| OF DELAWARE, P.A., | ) | |
| | ) | |
| Defendant. | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on March 14, 2005, I electronically filed **DEFENDANT REPRODUCTIVE ASSOCIATES OF DELAWARE, P.A.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

> Jeffrey K. Martin, Esquire
> Margolis & Edelstein
> 1509 Gilpin Avenue
> Wilmington, DE  19806


> *David H. Williams*
> _____
> David H. Williams (#616)
> Jennifer L. Brierley (#4075)
> MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
> 222 Delaware Avenue
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6900
> dwilliams@morrisjames.com
> Attorneys for Defendant

Dated:  March 14, 2005          Reproductive Associates of Delaware, P.A.

DHW/016459-0003/1096056/1