# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LYNN SANSOUCIE, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-861-JJF |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| REPRODUCTIVE ASSOCIATES | ) | |
| OF DELAWARE, P.A., | ) | |
| | ) | |
| Defendant. | ) | |


### APPENDIX TO DEFENDANT
### REPRODUCTIVE ASSOCIATES OF DELAWARE, P.A.'S ANSWERING BRIEF
### IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

### VOLUME II OF III


David H. Williams (#616)
Jennifer L. Brierley (#4075)
MORRIS, JAMES, HITCHENS & WILLIAMS LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900
dwilliams@morrisjames.com
Attorneys for Defendant
    Reproductive Associates of Delaware, P.A.


Dated: March 14, 2005

# TABLE OF CONTENTS

<u>Testimony</u>                                                                                 <u>Page</u>

Deposition Testimony of Lynn Sansoucie
     January 13, 2005 ...........................................................................................B-1

        Scientific Presentations ( Deposition  Exhibits) ...........................................B-96

<u>Affidavits</u>

Affidavit of Marc Portmann
     February 14, 2005 .......................................................................................B-99


<u>Documents</u>

Letter to M. Portmann from L. Sansoucie
     October 2000...............................................................................................B-106

L. Sansoucie Resume
     October 2000...............................................................................................B-107

L. Sansoucie's Application for Employment at RAD
     October 25, 2000.........................................................................................B-110

L. Sansoucie's Time Sheets
     October 28, 2000 to May 12, 2001 .............................................................B-112

E-Mail Communication from Dr. Feinberg to L. Sansoucie
     May 6, 2001 ...............................................................................................B-128

Payroll Records for L. Sansoucie
     November 2000 to December 2003 .............................................................B-129

Letter of Resignation
     February 4, 2004 ........................................................................................B-132

L. Sansoucie Resume
     February 9, 2004 ........................................................................................B-133

Medical Technologist Certificate of L. Sansoucie....................................................B-137

Clinical Laboratory Certificate of L. Sansoucie .....................................................B-138

Job Description for Embryologist at RAD..................................................................B-139

Job Description for Andrology/Endocrine Technician at RAD................................B-143

L. Sansoucie Business Card.......................................................................................B-147

Scientific Presentations.............................................................................................B-96

Defendant's Answers to Plaintiff's Interrogatories
January 14, 2005 ........................................................................................................B-148

51

1    working as an embryologist in the IVF lab?

2          A.    Yes.

3          Q.    We've talked about ICSI a few times now.

4    That's something else that I think you've already said

5    you performed that?

6          A.    Correct.

7          Q.    As did Marc Portmann?

8          A.    Well, I wasn't officially doing it all by

9    myself.  I would do some of the eggs.

10          Q.    You would do some and he would do some?

11          A.    Yes.

12                MR. MARTIN:  Dave, just let us know when

13    a good time for a break would be.

14                MR. WILLIAMS:  That's fine.  If you want

15    to take a break now, that's good.

16                (Brief recess taken.)

17    BY MR. WILLIAMS:

18          Q.    I want to circle back for a minute to

19    something you talked about earlier.  That is, the egg

20    retrieval step in the process.  Part of what you are

21    doing is determining which eggs to preserve, which ones

22    to use in the in vitro fertilization process.  Isn't that

23    right?

24          A.    Not during the egg retrieval.

CORBETT & ASSOCIATES                    B - 51

1       Q.    Okay.  At what point do you do that?

2       A.    At the point after they are hyaluronidased to

3   see which are mature and which are not.  We only ICSI

4   mature eggs.  So if they are not mature, they don't get

5   used.

6       Q.    Okay.  And I assume you are using microscopes

7   and other technical instruments in order to examine eggs,

8   for example?

9       A.    Microscopes.

10      Q.    With respect to the ICSI process, can you

11  describe in more detail exactly what it consists of?

12      A.    It consists of setting up a dish, a special

13  dish, and putting needles on a microscope, and it's

14  called manipulation because you manipulate the needle to

15  pick up a sperm by mouth pipetting into the needle and

16  then injecting it into an egg.

17      Q.    And you are doing all this under a microscope?

18      A.    Under a microscope.

19      Q.    And what other instruments or tools are you

20  using in performing the procedure?

21      A.    Just really a microscope.  There is a monitor

22  hooked up to everything, but that isn't needed to do the

23  procedure.

24      Q.    What are some of the things that can go wrong

CORBETT & ASSOCIATES

LYNN T. SANSOUCIE

53

1    during the execution of that procedure which would result

2    in either destroying the egg or not being successful in

3    fertilizing the egg?

4         A.    That's it.

5         Q.    Well, are you successful 100 percent of the

6    time?

7         A.    No.

8         Q.    And the extent to which you achieve success or

9    don't achieve success depends in large part upon the

10   skill of the person executing the procedure?

11        A.    That helps, but that isn't a large part of it.

12   Because human nature, nature has to take its course and

13   fertilize the egg.  You can do it correctly and the egg

14   won't fertilize.  That doesn't necessarily mean it's your

15   fault.

16        Q.    The more skilled you are, the higher

17   percentage of success you will achieve.  Is that a fair

18   statement?

19        A.    Depending on the egg quality.

20        Q.    And improperly executed, the procedure could

21   result in destroying the egg?

22        A.    You can.  I've never seen that, but, yes, you

23   can.

24        Q.    What was your success rate?

LYNN T. SAN SOUCIE

54

1    A.    While I was still learning, I believe like 75

2    percent.

3    Q.    And as you acquired more skill, what success

4    rate did you achieve?

5    A.    Well, I didn't get to do very much there at

6    Reproductive Associates.  I would do like four eggs, five

7    eggs of a large cycle.  So it's hard to tell.  But what I

8    did fertilized, you know, pretty well.

9    Q.    Did you grade embryos to identify which

10   embryos were the best embryos?

11   A.    Yes.

12   Q.    That involves the exercise of discretion, does

13   it not?

14   A.    Yes.

15   Q.    Did you determine which embryos should be

16   frozen and which should not be frozen?

17   A.    Yes.

18   Q.    And that also involved the exercise of

19   discretion?

20   A.    Yes.

21   Q.    And judgment?

22   A.    Yes.  I wanted to add that Marc would always

23   have to check that, though.  It was never our final

24   decision.

B - 54

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

55

1      Q.    Didn't you collaborate with each other in the

2  IVF lab frequently?

3      A.    What do you mean by that?

4      Q.    Well, as two embryologists working in an IVF

5  lab, would you collaborate with each other about various

6  judgments that had to be exercised?

7      A.    Yes.

8      Q.    Consult with each other?

9      A.    Yes.

10     Q.    And would you agree that that kind of a

11  collaborative approach between two embryologists working

12  together in an IVF lab is the best approach to use and is

13  going to achieve the best results?

14     A.    No.

15     Q.    You agreed earlier that Dr. Tucker is one of

16  the leading people in the field of embryology?

17     A.    Yes.

18     Q.    I'm going to hand you a document that doesn't

19  actually bear a Bates stamp.  Maybe we should identify

20  this as an exhibit, Exhibit No. 1 to your deposition.

21              (SanSoucie Deposition Exhibit No. 1 was

22  marked for identification.)

23  BY MR. WILLIAMS:

24     Q.    Have you seen this document before?

B - 55

CORBETT & ASSOCIATES

56

A.    I think I had saw it in the computer at
Reproductive.

Q.    This was prepared by?

A.    Marc.

Q.    And Dr. Feinberg --

A.    Oh.

Q.    -- and Dr. Tucker also are attributed in this
document, are they not?

A.    Yes.

Q.    And the document, as I understand it, talks
about the fact that in smaller IVF labs where there is
only a single embryologist, there is a lack of
collaboration, and the objective is to create a process
which in that circumstance would allow for collaborative
evaluation of such issues as developing embryos.  Is that
right?  Is that your understanding?

A.    That's my understanding at Reproductive
Associates.

Q.    And to the extent that it's the view of
Dr. Tucker and Dr. Feinberg that collaboration among and
between embryologists working in a lab is a good thing,
is it your testimony that you have a different
professional opinion than they do?

A.    Yes.

B - 56

CORBETT & ASSOCIATES

57

1    Q.    And do you consider yourself to be more

2    qualified in the field than Dr. Tucker?

3    A.    No.

4    Q.    Pardon me?

5    A.    No.

6    Q.    Do you consider yourself to be more qualified

7    in the field than Dr. Feinberg?

8    A.    In IVF?  As to procedures, maybe, yes.

9    Q.    So, in your view, collaboration is just either

10   not worthwhile or actually a bad thing?

11   A.    Yes.

12   Q.    What happens if the wrong embryos are chosen

13   to be frozen?

14   A.    If the wrong embryos are chosen?  Do you mean

15   the wrong patient or the wrong -- what they look like?

16   Q.    What they look like.  The exercise of judgment

17   and discretion as to which embryos to freeze.  What

18   happens if you exercise bad judgment and bad discretion?

19   A.    You will -- you don't really know that.

20   Because freezing isn't guaranteed to provide an embryo

21   when you thaw it.  A lot get lost.

22   Q.    Well, if you freeze the wrong embryos, the net

23   result of that at the end of the road is going to be a

24   lower fertilization rate?

CORBETT & ASSOCIATES

B - 57

58

A. Right.

Q. And the objective is to have as high a rate as you can achieve?

A. Right.

Q. With respect to thawing embryos, isn't it correct that there has to be judgment and discretion exercised as to how many embryos should be thawed and when the thawing is complete?

A. Again, each place has their own, their own rules.

Q. I understand that.

But my question is: Isn't it correct that there has -- someone has to exercise judgment and discretion as to how many to thaw?

A. Yes.

Q. And when the thawing is complete?

A. When to do it, when to process the specimen?

Q. Correct.

A. Yes.

Q. And that's something you did?

A. No.

Q. You never did it?

A. I didn't decide how many to be thawed. That was the doctor's decision.

LYNN T. SAN SOUCIE

59

1      Q.    When you were at Reproductive, you had contact

2    with patients.  Is that right?

3      A.    Yes.

4      Q.    And you have to know how to communicate the

5    proper information to the patients in the proper way?

6      A.    Yes.

7      Q.    When you discover problems in the lab such as

8    poor embryo quality or fragmentation, do you have to make

9    a determination as to whether those are laboratory

10   problems versus a patient problem?

11     A.    If it -- if it became more constant, if you

12   saw like a trend, then you would look within the lab or

13   medication that was given to the patient or the

14   stimulation.

15     Q.    And that's something you were involved in

16   trying to determine?

17     A.    If -- yes.  Yeah, I was.

18     Q.    And that involves exercising some judgment and

19   discretion?

20     A.    Actually, I was told what to do.  I was told

21   what to do, how to do it.

22     Q.    Describe what you were told?

23     A.    If we had a problem where there was a lot of

24   fragmentation, Marc would tell me to monitor with a probe

B - 59

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

60

1  that he would show me how to monitor and just keep a

2  track of temperatures for a while to see.  Or we could

3  set up mouse -- we had assays to test, so we would set up

4  mouse assays to see if anything affected those, if the

5  embryos died or whatever.

6      Q.    And you performed that?

7      A.    Yes.

8      Q.    With respect to andrology, define what that

9  is, first of all?

10     A.    That's a testing of sperm.

11     Q.    Okay.  In deciding whether to freeze sperm or

12 not to freeze it, do you have to make a determination as

13 to whether there is enough sperm to survive a thaw of the

14 sperm?

15     A.    I never -- I never remember having to do that.

16 They froze everyone's sperm that came through IVF.  It

17 was used as a backup.

18     Q.    What does the acronym IUI stand for?

19     A.    Intrauterine injection.  They put -- I never

20 did them.  I just set them up.  But I imagine -- I never

21 even saw one, so I can't even describe it.  But it was

22 injecting the sperm into the uterus.

23     Q.    But you have to prepare the sperm for

24 injection?

LYNN T. SAN SOUCIE

61

1      A.   Yes.

2      Q.   And how do you do that?  What are the steps in

3  doing that?

4      A.   Basically you would add some media to the

5  sperm, take a count -, before you added the media, you

6  would take a count.  You would add the media, spin it

7  down, remove -- what happens is a pellet forms on the

8  bottom, and that's the good sperm.  So remove the

9  supernatin off the top with a pipette and then add some

10  media, resuspend it to the bottom and count the modal

11  sperm and the nonmodal sperm.

12      Q.   And that processing of the sperm that you have

13  described is all aimed at maximizing the chances of a

14  successful procedure?

15      A.   Yes.

16      Q.   Define endocrine.  What is that?

17      A.   That's the running of the hormones for the --

18  that we run to see if they, they were ready to have a

19  retrieval or they were ready for their IUI, and they

20  would be given medication to raise the hormones to a

21  certain level so they can ovulate or not ovulate and

22  produce eggs.

23      Q.   And you reported and reviewed the results of

24  that?

B - 61

A.    I reported the ones I ran.

Q.    Did you have to determine when the results or the reports -- well, when the process might need to be reviewed or rerun before reporting it to the physician?

A.    If someone had -- yes.

Q.    So you would have to exercise judgment as to those situations where you would want to rerun it based upon the data?

A.    Well, if they had a result that was way different before, then you would.  Otherwise, you really wouldn't know.

Q.    With respect to drawing blood, which you did at Reproductive.  Correct?

A.    Yes.

Q.    You have to choose an appropriate draw site. Is that right?

A.    Yes.

Q.    And then there are certain guidelines you have to follow in order to reduce the chances of infection and so forth.  Is that correct?

A.    Really reduce the chances of hematoma, which would be a big bruise, but sometimes it's unavoidable.

Q.    But the degree to which the person drawing the blood is skilled will reduce the frequency of a bruise?

LYNN T. SAN SOUCIE

63

1    A.    Yeah, I guess so.

2    Q.    I mean, some people are going to bruise

3    anyway, but improperly done --

4    A.    Yes.

5    Q.    -- you are going to bruise most everybody.    Is

6    that fair to say?

7    A.    Yes.    Mm-hmm.

8    Q.    And you want to avoid that?

9    A.    Right.

10    Q.    And in doing the process, you have a physician

11    test order that's kind of the starting point of the

12    process?

13    A.    Yes.

14    Q.    So then you have to choose the appropriate

15    blood draw tubes depending upon the test order?

16    A.    Yes.

17    Q.    Do you have to also know what order they must

18    be drawn in order to obtain accurate specimens?

19    A.    Yes.

20    Q.    And, again, these are all things that you

21    did --

22    A.    Yes.

23    Q.    -- at Reproductive?

24    And you have to understand what are the

CORBETT & ASSOCIATES

64

```
 1   minimum blood draw requirements, depending upon the

 2   purpose of the test?

 3        A.   Yes.

 4        Q.   You also have to process the blood?

 5        A.   Yes.

 6        Q.   What does that involve?

 7        A.   You have to put it in a centrifuge after it

 8   clots for a certain amount of time and then spin it down.

 9   And we're actually using the serum.  The blood separates

10   for the tests that we are doing.  The rest of the tests

11   get sent out.

12        Q.   When you say after it sits for an appropriate

13   time, you have to know how much time it has to sit or you

14   have to observe it to make a judgment?

15        A.   You should let it sit for 15 minutes, which

16   isn't always done, or at least until it clots.

17        Q.   So you have to know what you are looking at

18   when you examine the sample in order to know whether it's

19   been sitting long enough?

20        A.   Yes.

21        Q.   Are some patients prone to fainting or

22   otherwise apprehensive about drawing blood?

23        A.   Oh, yes.

24        Q.   So you have to know what to do with those
```

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

65

people and how to handle them?

A.   You call a nurse.

Q.   We've already talked about this a little bit, but just briefly, let's talk about endocrine.   To what extent are you exercising judgment and discretion in that process?

A.   I'm not sure if there is any.   You are just putting the specimen onto an instrument and the instrument is reading the results.   So if your controls come in, you have to assume your results are correct.

Q.   Don't you have to use discretion and judgment in order to determine the validity of the results in light of the daily, weekly, and monthly values?

A.   You just have to know that your controls came in that day.

Q.   What do you mean when you say you just have to know that your controls came in that day?

A.   Well, then you know the specimen, as far as you know, is giving you the correct value, unless there is something way, way off.   But you wouldn't really know that unless they had a result the day before that was so different.

Q.   And what you're securing is what is called QC data?

1    A.    Yes.

2    Q.    What does that stand for?

3    A.    Quality control.

4    Q.    And you have to determine whether it's in an

5    acceptable range or, on the other hand, whether you

6    suspect that the patient results have to be rerun and not

7    reported?

8    A.    There was a -- yes, there was a computer

9    program that you would put the number in and it would

10   tell you if it's out and give you the range.

11   Q.    What kind of instruments and equipment are you

12   using in the lab to do this?

13   A.    My mind is blank.  They had an old instrument

14   in there.  I'm sorry, my mind went blank as to the name

15   of the instrument.

16   Q.    Okay.  In the lab are you also performing

17   maintenance and preventative maintenance on the

18   instruments and equipment that you are using?

19   A.    Yes.

20   Q.    Weren't you also responsible for ordering

21   supplies?

22   A.    Yes.

23   Q.    You had to be trained with respect to the use

24   of various instruments in the lab, and if they get new

LYNN T. SAN SOUCIE

67

1    instruments, you have to be trained on new instruments?

2         A.    Yes.

3         Q.    Do you dilute patient specimens?

4         A.    If they're high.

5         Q.    And so you have to use judgment and discretion

6    to know what degree you need to dilute the specimen?

7         A.    Yes.

8         Q.    And you did that?

9         A.    Yes.

10        Q.    In collecting sperm and analyzing it, was part

11   of your training and knowledge base understanding the

12   male physiology and what deficiencies might result in

13   various diseases that could affect sperm counts?

14        A.    No.  I didn't have to know that to process

15   sperm.

16        Q.    If there was a low count, wouldn't you want to

17   know what was causing that low count or try to determine

18   that?

19        A.    That wasn't really my job.

20        Q.    Did you discuss with patients the results of

21   testing?

22        A.    No.

23        Q.    You never communicated with patients?

24        A.    Sometimes they would call to get a sperm --

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

68

1   their sperm count.  But I didn't do that very often.

2   That was the andrology lab.

3        Q.   Did you ever have occasion to assist

4   Dr. Feinberg in the operating room when he was involved

5   in securing samples?

6        A.   One time.

7        Q.   What did that involve?

8        A.   Standing in there waiting for him to hand me

9   the tubes.

10       Q.   What kind of sample was he securing?

11       A.   The eggs from a patient.

12       Q.   Was that the only sampling process that you

13   were involved in?

14       A.   With Dr. Feinberg, yes.

15       Q.   And then you would examine the egg?

16       A.   Well, that was one time.  I had to take it

17   back to the lab and then we looked at them there.  It was

18   a patient who had a problem, they couldn't get in, I

19   think they went through the naval.  They had to do it

20   laparoscopically.

21       Q.   When you are processing a sperm sample and

22   it's a poor sample, I think you described this earlier,

23   you have to spin it down in order to maximize the

24   potential for that to result in fertilization?

LYNN T. SAN SOUCIE

69

1      A.   It's done with every sample.

2      Q.   Okay.  And you have to make a decision about

3   how much you spin it, do you not?

4      A.   There is a set time.

5      Q.   In all samples?

6      A.   Yeah.

7      Q.   Doesn't it depend on the quality?

8      A.   If you have a really, really low count, you

9   wouldn't spin it as hard at the same time, but you could

10  also make a judgment to lessen it a little bit.  But most

11  of the time it's done the same.

12     Q.   Those are judgments that you would make?

13     A.   Right.

14     Q.   Do you still have in front of you the resume

15  you prepared after you left Reproductive?

16     A.   Yes.

17     Q.   It's the document that's marked D12 through

18  D15.

19     A.   That was the resume that I put on line.

20  Right?

21     Q.   Correct.

22          On page D14, where you describe your

23  experience as an embryologist at Reproductive,

24  embryologist and assistant lab manager, you talk about

CORBETT & ASSOCIATES

1    all aspects of the ART Department.   What is that?

2        A.    Assisted reproductive technology.   That's the

3    IVF lab.

4        Q.    That's another way to describe the IVF lab?

5        A.    Correct.

6        Q.    Micromanipulation of gamates, what is that?

7        A.    That's ICSI.

8        Q.    Including assisted hatching.   What does that

9    involve?

10        A.    That, by the time I started doing it, was

11    using a laser.   That would just zap and hatch the egg.

12    You would put the dish of embryo under whatever one you

13    are going to transfer under the microscope, and a little

14    laser circle would appear and you would put it up to the

15    egg and hatch that area so you would just zap it.   It

16    would just -- wouldn't harm the egg, the embryo.

17        Q.    Could you harm the embryo if you did it

18    improperly?

19        A.    If you put the -- put it directly on the egg,

20    the embryo, I'm sorry, and just zapped the embryo itself,

21    yes.

22        Q.    There is also an instrument that's described

23    here.   What is that?

24        A.    Tosoh.   That's the one I didn't have a name

1    of, that I couldn't remember the name.  That was the one

2    that ran the bloods, the endocrine testing.

3        Q.    Is it a fair reading of the resume you

4    prepared for prospective employers to say that you held

5    yourself out as someone who was fully trained and

6    qualified in virtually all aspects of working in an IVF

7    lab?

8        A.    Yes.

9        Q.    And held yourself out as one who had the

10   experience and skill to do all those tasks?

11       A.    To an extent, yes.

12       Q.    Well, you say to an extent, yes.

13             Is there some reservation stated in your

14   representation to prospective employers as to your

15   experience and skill to perform all aspects of what might

16   occur in an IVF lab?

17       A.    Well, given the years of experience is how

18   someone will go, they will determine how good you are in

19   a lab, depending -- and that's how they will hire you, by

20   how long you have worked in an IVF lab.  So two or three

21   years isn't someone that's really, really experienced.  I

22   may know how to do all these things, but it would be a

23   judgment as to the person hiring you.  So...

24       Q.    Okay.  So you are always learning and growing

LYNN T. SAN SOUCIE

72

1    in terms of your professional skills?

2         A.    Yes.

3         Q.    Is that what you are suggesting?

4         A.    Yes.

5         Q.    This resume is an accurate representation to

6    the prospective employers with respect to your

7    educational experience, background, and with respect to

8    your work experience and with respect to your skills?

9         A.    Yes.

10        Q.    Did you secure a position as an embryologist?

11        A.    Before I even put this on the Internet I did.

12        Q.    And you have a full-time position?

13        A.    Yes.

14        Q.    On page D14 under personal details, what are

15    these various, it says professional societies that you

16    belong to?

17        A.    These are groups that meet.  ASRM is one that

18    I belong to for embryologists where you pay a fee and you

19    also get magazines every month.  The Delaware Valley

20    Reproductive Biologists is a group of -- it's free, and

21    it's all people that work in IVF, and you can go and

22    listen to lectures every, like three times a year, four

23    times a year.  PARES is another group that meets.  I

24    don't know what that stands for, but that -- when you

CORBETT & ASSOCIATES

B - 72

LYNN T. SAN SOUCIE

73

1   want to go to the lecture, you pay for that.  NCA is my

2   certification.  And United Clinical Practitioners is

3   another one that I belong to for my certifications.

4        Q.   And these are all professional societies?

5        A.   Yes.  And the meetings, anyone can go to them,

6   the secretaries, the medical assistants, anyone in the --

7   that works in the office is allowed to attend.

8        Q.   Did Reproductive pay membership fees to some

9   of these professional societies on your behalf?

10       A.   The ASRM they did.  They also pay -- I'm

11  sorry, they also paid for PARES.  Like if I wanted to

12  attend a meeting, they paid for that.  It would be like a

13  dinner meeting.

14       Q.   And in this Society for Reproductive Medicine,

15  there are physicians and senior-level embryologists

16  involved in that association?

17       A.   There is all different types of people

18  involved in that.  But the meeting that I went to would

19  just have a dinner with a lecture.

20       Q.   I just want to ask you about a couple things I

21  don't think you mentioned, at least not in any detailed

22  way, and then I'm almost done.

23            When an embryo is developing, did you do

24  testing to determine whether there might be problems and

CORBETT & ASSOCIATES

B - 73

LYNN T. SAN SOUCIE

74

1  to assess the likelihood of proper development?

2     A.  No, I didn't.

3     Q.  At any point prior to filing this lawsuit, did

4  you complain to Reproductive about not receiving overtime

5  compensation at a premium rate on those occasions when

6  you worked over 40 hours in a work week?

7     A.  Not to Dr. Feinberg.  Just among other

8  employees.

9     Q.  And who did you lodge such a complaint with?

10    A.  Various people, nurses, when I would be

11  working three weeks straight and not be able to take off

12  on the weekend.

13    Q.  Who did you make a complaint to and what did

14  you say?

15    A.  I would complain -- oh, I would complain with

16  Linda, I would complain with Linda Morrison.  I would

17  complain with Peg Brown.  I would complain with Ann

18  Marie, who is the -- I don't know how to spell her last

19  name.  It's En-jay-in.  She has a married name.  In the

20  lunchroom.

21    Q.  What would you say?

22    A.  Just that I'm working all these hours.  It's

23  horrible.  I can't take off.  If I would ask for time off

24  or a weekend off, I would get yelled at by Marc.

B - 74

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

75

1        Q.    So you complained about the hours you were

2    working?

3        A.    Yes.

4        Q.    My question is:  Did you complain to any

5    supervisor to the effect that you should be paid at a

6    premium rate if you worked for in excess of 40 hours in a

7    work week?

8        A.    I couldn't.  I couldn't.  I was actually in

9    fear when I worked there of Marc.  I didn't want to lose

10   my job.

11       Q.    Did you lodge the complaint that I have just

12   described to anyone, apart from just saying I'm working a

13   lot?

14       A.    No.  No.

15       Q.    You never communicated any complaint to

16   Dr. Feinberg?

17       A.    No.

18       Q.    What records did you keep with respect to the

19   hours that you worked?

20       A.    I had a calendar that I had made copies of.

21   And the other was my bridge toll when I would go through

22   the Delaware Memorial Bridge.

23       Q.    Are you saying that you have records that have

24   been produced reflecting the hours that you worked?

1          A.    Yes.

2          Q.    What did you record on your calendar

3    specifically?

4          A.    Days worked, basically, and various times,

5    times that I went in earlier, like I would go in at 6:30

6    or 6:00.

7          Q.    And you would record each of those events on

8    your calendar?

9          A.    Yes.   Yes.

10         Q.    And it's your testimony that you never left

11   early, you never took a long lunch, you never took

12   compensatory time off or professional time off?

13         A.    You are saying never.   I --

14         Q.    Well, I'm trying to repeat what I understood

15   your testimony to be.   If it's inaccurate, tell me.

16         A.    I never took a long lunch.   Towards the end of

17   my employment there, I made a couple dental appointments

18   in the morning and would come in an hour or two late,

19   which I put on the calendar, which they should have a

20   record of because it's in their computer.   And I didn't

21   take all of my vacation that I was allowed to take

22   because when we were up in cycle, I wasn't allowed to

23   have off.   And if I did ask for a day off, I would be

24   made to feel like I was going to be yelled at.

LYNN T. SAN SOUCIE

77

1            So the answer to that is I took some,

2   but not a lot, not what I was entitled to.   And I never

3   took a long lunch.   I very rarely left the building.

4   They must be mistaking me for the other worker that works

5   there.

6        Q.    Who is they?   I'm not sure who you are

7   referring to.

8        A.    Reproductive.   I know they had said I took

9   long lunches.

10       Q.    When you received the e-mail from

11  Dr. Feinberg which is D32 --

12       A.    Yes.

13       Q.    -- and he told you that you were going to be

14  paid a salary of 62,500, that represented an increase in

15  salary or in annualized compensation for you compared to

16  your prior employment?

17       A.    Yes.

18       Q.    And paragraph 3 of his e-mail told you that

19  there would be occasions when weekend laboratory work

20  would be required as part of the job?

21       A.    Yes.

22       Q.    And that's because in this fertilization

23  process, once it starts, there has to be an ongoing

24  monitoring process and so forth throughout the entire

B - 77

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

78

1    process, you can't just take a weekend off.

2        A.    You do need someone there, one person there.

3        Q.    And so when you received this e-mail from

4    Dr. Feinberg, you didn't raise with him a question about

5    additional compensation above and beyond your annualized

6    salary if you worked on weekends?

7        A.    When I got this, I didn't think that I would

8    be working 21 days straight without a day off.  You can

9    work a weekend and have a day off during the week.

10       Q.    So it was your understanding that you would

11   work no more than five days in a work week?

12       A.    Yes.

13       Q.    And did you confirm that understanding in any

14   way with Dr. Feinberg?

15       A.    No.

16       Q.    After you arrived, you just never raised the

17   issue?

18       A.    No.

19       Q.    And how long did you work there?

20       A.    I complained about working the weekends in IVF

21   and andrology.  But I got -- I got really -- I got yelled

22   at for that by Marc Portmann.  So I learned to not say

23   anything more.

24       Q.    When did you leave?

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

79

1        A.    February of last year.

2        Q.    After you left and prior to the time that you

3    filed this lawsuit, did you lodge any complaint with

4    Dr. Feinberg or Marc Portmann or anyone else at

5    Reproductive in a position of authority with respect to

6    asserting a claim for overtime compensation?

7        A.    No.

8        Q.    You did lodge with Marc Portmann and others

9    complaints, other kinds of complaints about Marc

10   Portmann, did you not, after you left and before you

11   filed this lawsuit?

12       A.    I responded to an e-mail from someone that I

13   was in contact with, and we both complained.

14       Q.    I am handing you a document that is identified

15   as D46 through D49 and ask if you can tell me what that

16   is?

17       A.    They make this up at Reproductive, they made

18   it up, and it's people -- our duties and job skills for

19   the function we are doing, what's required of us.

20       Q.    You saw this document?

21       A.    Yes.

22       Q.    And as of 11/13/2001, you were there as a

23   full-time employee?

24       A.    I think it was 2001, yes.  I believe so, yes.

LYNN T. SAN SOUCIE

80

1    Q.    This document accurately describes your job?

2    A.    Except for the Bachelor's degree.

3              MR. MARTIN:  And you are referring to

4    all three pages or four pages?

5              MR. WILLIAMS:  Correct.

6              MR. MARTIN:  All right.  I ask that she

7    be given an opportunity to carefully review that.

8              THE WITNESS:  I don't think this is the

9    original one, because PGD testing wasn't even being done

10   in 2001.  So I think this was done when they -- remade

11   when they did their CAP certification.  This doesn't look

12   like the one that I read.  I might have the original.

13   BY MR. WILLIAMS:

14   Q.    My question is, that you responded to earlier,

15   is does it accurately describe your job?

16   A.    Yes.

17   Q.    And let me hand you a document that's marked

18   D50 through D53 and ask whether this document is a

19   document that you are familiar with?

20   A.    This one looks more -- let me finish reading

21   it.  Okay.

22              Now, what was your question again on

23   this?

24   Q.    First of all, are you familiar with the

B - 80

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

81

1    document?

2        A.    This one looks more familiar, but I can't say

3    for certain that it's -- it's the one that I've read.

4        Q.    To the extent that you worked in the

5    andro/endo lab, does this document accurately describe

6    your responsibilities?

7        A.    Yes.

8        Q.    I am handing you a document that's entitled

9    RAD Lab Training Protocol that's marked as D20 through --

10   I'm sorry, D200 through D218.

11           Are you familiar with this document?

12       A.    I never saw this.

13       Q.    Okay.   I have no questions about it if you

14   never saw it.

15           And I am handing you a document that's

16   identified as D82 through D99 titled The in Vitro

17   Fertilization Program, Patient Information and Consent

18   Forms.

19           Are you familiar with this document?

20       A.    I never saw this either.

21           MR. WILLIAMS:   I think I'm almost done,

22   or close to it.   Let me just take a break for a few

23   minutes.

24           (Brief recess taken.)

B - 81

CORBETT & ASSOCIATES

LINDA SAN SOUCIE

82

1          MR. WILLIAMS:  I just have a few more

2     questions and we're all done.

3     BY MR. WILLIAMS:

4          Q.   I'm putting before you a document that is a

5     record of salary payments, it's D36, D35 and D36.  I

6     asked you about this earlier.  But you were employed on a

7     part-time basis and then became a full-time employee.  It

8     looks like that occurred in June of 2001.  Does that

9     sound right?

10         A.   Yes.

11         Q.   And at that point the salary that you started

12    with, which was 62,500, was paid in equal monthly

13    installments.  It looks like that amounted to $5,200, at

14    least at the outset.  Does that square with your

15    recollection?

16         A.   Yes.

17         Q.   So your gross pay was that amount per month,

18    and your net pay was 4,579.17?

19         A.   Yes.

20         Q.   So that's in excess of payment at a rate of a

21    thousand dollars plus a week?

22         A.   Yes.

23         Q.   And then it looks like your salary went up at

24    the beginning of 2002.  Do you see that --

B - 82

LYNN T. SAN SOUCIE

83

1    A.    Yes.

2    Q.    -- increase?

3          And it appears that 5,417, and the

4    number jumped around a little bit in the early months,

5    but that that amount, and maybe that has something to do

6    with deductions, but that that amount would have been the

7    equal monthly installment of whatever your annualized

8    salary was as it was increased at that point?

9    A.    Yes.

10   Q.    And that you were paid at at least that rate

11   through the balance of your employment with Reproductive?

12   You didn't receive any decreases?

13   A.    No.

14   Q.    One thing that perhaps is already clear, but

15   maybe not.  As I understand the way the andro/endo lab

16   worked in conjunction with the IVF lab, would it be fair

17   to say that mistakes in the andro/endo lab would have an

18   effect upon the IVF lab because everything was kind of

19   interrelated?

20   A.    Yes.

21   Q.    This document does not have an identification

22   on it, but as I understand, it was produced by your

23   counsel.  It appears to be an EZ-Pass record?

24   A.    Yes.

B - 83

LYNN T. SAN SOUCIE

84

1     Q.    You referred earlier with respect to

2  information that you might have with respect to the hours

3  and days that you worked that the EZ-Pass records would

4  be part of that puzzle.  Is that right?

5     A.    Yes.

6     Q.    And that's what you are referring to?

7     A.    Yes.

8     Q.    And you have produced all the relevant EZ-Pass

9  records?

10    A.    As far as I know.

11    Q.    To the best of your knowledge?

12    A.    Yes.

13    Q.    Provided them to your counsel?

14    A.    Yes.

15    Q.    And I am handing you what appears to be a

16  calendar, and these do have numbers, 22 through 26.

17            And just for clarity of the record, the

18  document that I handed you earlier is numbered 46 through

19  57?

20    A.    Yes.

21    Q.    That's at least a portion of the calendars

22  that you refer to?

23    A.    Yes.

24    Q.    If I place before you documents which also are

LYNN T. SAN SOUCIE

85

1    calendars that are numbered 27 and 28, are those your

2    calendars or copies of portions of your calendar?

3         A.    Yes.

4         Q.    To the best of your knowledge, do we have

5    copies of all of the relevant portions of your calendar?

6    By relevant, I mean the ones that relate to the number of

7    days or hours that you worked at Reproductive?

8         A.    Yes.

9         Q.    And it looks like I have a lot of additional

10   EZ-Pass, I'm not sure what these are, maybe you can

11   identify them.  They look like they are printed off a

12   computer screen.  But they are numbered 58 through 145.

13   Tell me what they are?

14        A.    These are when I called EZ-Pass and asked the

15   supervisor to print up all my going through the tolls if

16   he could.  And this is what he sent me.

17        Q.    And, to the best of your knowledge, that

18   covers the time period that you worked at Reproductive?

19        A.    Yes.

20        Q.    The entire time period?

21        A.    I believe pretty much of it.

22        Q.    On those occasions when you did not work a

23   40-hour work week, whether it was because you were sick

24   or you had a dentist appointment or you took a vacation

B - 85

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

86

1    day, or whatever the reason was, you continued to be paid

2    at the same salary level despite that absence, did you

3    not?

4         A.    Not for the vacation day.  That was deducted

5    from my vacation time.  I was allotted certain vacation

6    days and sick days.

7         Q.    But your monthly salary was not reduced?

8         A.    No, because I used those days.

9         Q.    Like most employees, you didn't have an

10   unlimited number of days of vacation, you had a certain

11   number of days of vacation you could take?

12        A.    Correct.

13        Q.    And you described at least one occasion when

14   you came in a few hours late because of a dental

15   appointment.  There was no deduction from your pay for

16   that, was there?

17        A.    No.

18        Q.    Were there any other occasions when for

19   whatever reason you came in late or left early?  And were

20   there -- I think you said earlier that you don't think

21   there were occasions like that other than the one

22   occasion.  Is that --

23        A.    Right before I left I went to a funeral, right

24   before I was fired, and I came in the next day and that's

B - 86

LYNN T. SAN SOUCIE

87

1    when I was fired and also resigned.  But I didn't --

2    well, I was supposed to get paid for the rest of the

3    month, and I didn't get paid.

4         Q.    That was the day before you resigned?

5         A.    Fired and resigned, yeah.  I also had a week's

6    vacation coming to me, which I had scheduled for May,

7    which I wasn't able to take before that.

8         Q.    You did submit a resignation, did you not?

9         A.    Well, I was called in to be fired, and at the

10   same time they fired me I said, that's good because I was

11   going to resign anyway.  And they said, that's good,

12   because that will make our job easier.  But we will pay

13   you until the end of the month.  You need to leave right

14   now.

15        Q.    So the answer to my question is, you did

16   submit a written resignation?

17        A.    After I was called in to be fired, yes.

18        Q.    You testified about this, but just to get it

19   in the record, and these are not identified at this

20   point, I would ask that they be identified, the first is

21   The Fate of Non-Transferred Embryos After Day 3 Assisted

22   Hatching.  And the other is Contribution of -- maybe you

23   better pronounce those terms because I will trip over

24   them.

B - 87

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

88

1      A.    Do you want me to read that?

2      Q.    Yes.

3      A.    Contribution of Blastocyst Cryopreservation to

4    Cumulative IVF Success.

5      Q.    I think you referred earlier to the fact, and

6    I think I asked you as to whether you were attributed as

7    one of the contributors to these scientific materials.

8    Are these the documents that we were both referring to in

9    that discussion?

10     A.    Yes.

11            MR. WILLIAMS:    Can we mark those as 2

12   and 3.

13            (SanSoucie Deposition Exhibit Nos. 2 and

14   3 were marked for identification.)

15   BY MR. WILLIAMS:

16     Q.    And, finally, I know we talked about this

17   earlier, but I'm still not sure I understand it.    In my

18   profession there are certain very specific requirements

19   in order to become a member of the profession or to be

20   certified, and I'm not sure I entirely understand what is

21   required in order to obtain the various certifications

22   you have obtained.

23            We talked about the medical

24   technologist, for example.    What do you have to do

CORBETT & ASSOCIATES

B - 88

LYNN T. SAN SOUCIE

89

1   educationally or otherwise in order to obtain the

2   certification and what ongoing requirements, if any, are

3   there to maintain it?

4        A.   You need to take a, it's an exam, a Board

5   certification, which I did.  And then you need to keep up

6   with, in order to keep it going, you need to provide them

7   with continuing education.

8        Q.   Who prepares the exam?

9        A.   The government.  It's a government exam for

10  each state, I believe.

11       Q.   And it is a technical exam that tests your

12  knowledge of skills and information relevant to the field

13  of medical technology?

14       A.   Yes.

15       Q.   And then you have continuing education

16  requirements in order to --

17       A.   Yes.

18       Q.   -- preserve the certificate?

19                 To what extent?  How many hours?

20       A.   I'm not sure of the amount of hours.  They

21  send it every, I believe it's every two years.  And

22  meetings and papers and different things count for that.

23  And I'm not sure of the exact amount that you need, but

24  it is pretty much like 30.

B - 89

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

90

1        Q.    Like 30 hours a year?

2        A.    I think, CEU's, continuing education credits.

3        Q.    So you have done that?

4        A.    Yes.

5        Q.    And the MLT, which is, as I recall, medical

6    lab technician --

7        A.    Yes.

8        Q.    -- certification, is that the same process?

9    Is there a certification test administered and then

10   requirements of continuing education in order to maintain

11   the certificate?

12       A.    That's just what it's called, MLT, medical lab

13   technician.  That's what you are called when you work in

14   a lab.  It's a name.

15       Q.    Well, in your resume you described it as a

16   certification?

17       A.    Well, the CLT is the certification for that.

18   MLT CLT.

19       Q.    They are interchangeable?  Is that what you

20   are saying?

21       A.    Yes.  Yes.

22       Q.    Why did you list both of them?

23       A.    Actually, it's not interchangeable, it's a

24   whole -- you are an MLT, but then you need a

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

91

1    certification.  It could be ASEP, it could be CLP.  There

2    is a couple other ones.  HEW.

3         Q.    But MLT is a certification?

4         A.    That's when you finish the school, you can be

5    an MLT, but then you need to take a test to be certified,

6    and then that gives you the certifying of whatever you

7    choose.  You could be certified in HEW, you can be

8    certified in ASEP.  It's a registry that you have to

9    take.

10        Q.    When you say finish school, what do you mean

11   by finish school?

12        A.    When you go through the amount of college

13   credits required.  You are required 60 for an MLT.

14        Q.    And you did that at Hahnemann?

15        A.    I did most of it there.

16        Q.    And then you finished up at Rowan?

17        A.    I went to Rowan, and then I did some more.  I

18   mean, I have been continuing all over trying to get my

19   college credits.

20        Q.    Is it harder to be certified as a medical

21   technologist than it is to be certified as an MLT?

22        A.    No, it's just a matter of having a B.S.,

23   getting the college credits.  It's no different.

24        Q.    And CLT, is that a subset of MLT certification

B - 91

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

92

1    or is it a separate and distinct certification?

2        A.    It's really separate.   MLT isn't really a

3    certification, it's the program that you went to and

4    that's what you end up being.

5        Q.    CLT is a certification?

6        A.    Yes.

7        Q.    In that you have to take a test?

8        A.    Yes.

9        Q.    And tell me again what that acronym stands

10   for?

11       A.    Clinical lab technician.

12       Q.    And who administers and prepares the exam?

13       A.    It's a national certification agency.   It's

14   done by the government.  I had to go into Pennsylvania to

15   take it.  They have state testing sites for Boards, they

16   are called Boards --

17       Q.    It's not --

18       A.    -- through Washington.  I know it comes out of

19   Washington.

20       Q.    Doctors also are Board certified.  Is it the

21   same --

22       A.    Like that.

23       Q.    -- concept?

24       A.    I would believe.  I'm not really sure.

B - 92

LYNN T. SAN SOUCIE

93

Q.    Is the same true of CLP?

A.    No.  That I just had to send in my, all my

transcripts.  That wasn't an exam I had to take.

Q.    And are there requirements, are there

requirements in order to maintain that status?

A.    Just the fee every year.

Q.    How about A.S.?

A.    No, that's an Associate's.  That's from your

college credits.

Q.    I'm just confused why you listed that under

the category certifications?

A.    It's not really a certification.  It's just my

mistake.

Q.    What is your estimate as to the overtime that

you are owed?

A.    I think I averaged it out to 51 hours a week.

Q.    Is that a guess?

A.    Well, I did an average.  Sometimes it was even

more.  It depended -- it depended how long we were in the

lab that day.  At least until noon or 1 o'clock from

being there at 6:00 in the morning.  So that's being kind

of stingy.

Q.    In order to do the averaging, did you prepare

a week-by-week analysis of how many hours you think you

B - 93

LYNN T. SAN SOUCIE

94

1    worked in each work week?

2        A.    I started writing it down according to -- I

3    think there was one paper where I started averaging it

4    out trying to figure it out and we came up with that

5    number, I came up with that number.  It's not exact.

6    It's kind of on the low end.

7        Q.    Well, I guess maybe I didn't ask the question

8    well, but is there a worksheet somewhere that you

9    prepared that goes week by week or month by month?

10        A.    The calendar that I had handwritten and the

11    tolls, the toll, it says when I went through and came

12    back out.

13        Q.    Did you review all those documents and then

14    come up with a worksheet for each week which identified

15    the number of hours you believe you worked in each week?

16        A.    I did to my best of my knowledge.  I tried,

17    yes.

18        Q.    So you have a worksheet somewhere where you

19    went through those documents and for each week identified

20    the number of hours you believe you worked?

21        A.    Yes.

22        Q.    Has that worksheet been produced?

23        A.    I think some of it was, yes.  You don't have

24    it?

B - 94

CORBETT & ASSOCIATES

LYNN T. SAN SOUCIE

95

1            MR. MARTIN:  I don't know.  Because I

2  did not do it with her.  So I will look for it, Dave, and

3  let you know.

4            MR. WILLIAMS:  And can I ask the

5  witness, if you haven't provided it to your counsel, to

6  provide it to your counsel.

7            THE WITNESS:  Sure, I will.

8            MR. WILLIAMS:  I have no further

9  questions.

10            MR. MARTIN:  Thank you.

11            (Deposition concluded at 12:59 p.m.)

12            (Presentation, reading and signing of

13  the deposition transcript was waived by the witness.)

14

15

16

17

18

19

20

21

22

23

24

CORBETT & ASSOCIATES

DEPOSITION
EXHIBIT
Sansone 1
DAO 14/30/05

# Electronic Embryo Evaluation (EEE) — Are 2 heads better than 1?

[1]M Portmann, [2]M Tucker, [1]BA McGuirk, [1,2]RF Feinberg. [1]Reproductive Associates of DE, Newark, DE; [2]Georgia Reproductive Specialists, Atlanta, GA; [3]Dept. Ob/Gyn, Yale Univ, New Haven, CT.

## Objective

Embryo morphologic assessment is vital for successful outcomes in all ART programs. For smaller IVF centers committed to minimizing multiple pregnancy risk, a single embryologist is often challenged with the task of identifying the highest quality embryos for transfer. Thus, we instituted a relatively inexpensive, yet effective electronic system for collaborative evaluation of developing embryos prior to uterine transfer, and have determined the impact of this initiative on implantation rates in our program.

## Design

Images of developing embryos were electronically transferred by the Embryologist to the off-site Laboratory Director for collaborative evaluation prior to embryo transfer. A consensus recommendation was provided to the patient following laboratory and clinical assessment. Based on this information, the patient made the final decision regarding number of embryos to be transferred.

## Materials and Method

Electronic embryo evaluation, EEE was carried out prior to uterine transfer in 78 fresh cycles and 15 frozen-thaw cycles during a 17-month period from October 1999 to February of 2001. Video images of embryos were digitized using a Snappy Video Snapshot (Play Incorporated Ver. 3.0) connected to a laptop computer. Images were then archived onto CD-RW disks using an external CD-RW drive. To ensure correct identification of embryo images, a character generator was positioned between the microscope camera and Snappy Video Snapshot to embed patient names and dates onto archived pictures. Images were taken on the morning of day 1 after insemination and continued each day at approximately the same time until day 6. Embryo morphological characteristics were recorded each day.

## Materials and Method (cont.)

The morning of embryo transfer, embryo images were sent via electronic mail to the off-site laboratory director. Embryo grading was evaluated by the off-site Laboratory Director and Embryologist. All transfers were carried out by the same physician.

### Results

| | With EEE | Without EEE | P Value |
|---|---|---|---|
| Avg. Embryos Per Transfer | 3.2 | 3.4 | N.S. |
| Clinical Pregnancy Rate | 56% (42/75) | 34% (28/83) | 0.09 |
| Ongoing/Delivered Pregnancy Rate | 41% (31/75) | 24% (20/83) | 0.25 |
| Embryo Implantation Rate | 24% (58/239) * | 13% (35/281) | 0.01 |
| Multiple Pregnancy Rate | 36% (9/42 twins, 6/42 triplets) | 32% (5/28 twins, 4/28 triplets) | |

* (p < 0.05)

* The higher implantation rate with EEE was statistically significant (p < 0.05).

## Conclusions

As nationwide demand for assisted reproduction steadily increases, both new and smaller IVF laboratories will strive for quality assurance. In this setting, the embryologist is responsible for culturing embryos with high implantation potential. This goal has been addressed in our Center by successfully utilizing a collaborative electronic embryo-evaluation system. In the near future, real-time video microscopy may provide off-site IVF Lab Directors further opportunities to assess egg and embryo quality, and to teach and critique specific techniques.



Network File Server

CD-R(RW)    Hard Drive



DEPOSITION
EXHIBIT

# The Fate of Non-Transferred Embryos After Day 3 Assisted Hatching

Marc Portmann MT, MHA 1, Lynn SanSoucie MLT 1, Linda Morrison MLT 1, Michael Tucker PhD, FBSol 1, Barbara McGuirk MD 1, Ronald Feinberg PhD, MD 1-1.

1 Reproductive Associates of Delaware, Newark, DE; 2 Georgia Reproductive Specialists, Atlanta, GA; 3 Yale Univ, New Haven, CT.

59th Annual Meeting of the American Society for Reproductive Medicine · October 2003 · San Antonio, Texas

## Objective

To determine if assisted hatching (AH) on day 3 affects blastocyst formation in non-transferred (NT) penultimate embryos.

## Design

Retrospective analysis of 84 IVF cycles in which remaining NT embryos were observed following day 3 embryo transfer. Blastocyst formation rates were compared in day 3 AH embryos versus those without day 3 AH.

## Materials and Method

Oocytes were retrieved in HTF (InVitrocare), hyaluronidased after 2 to 3 hours incubation and ICSI'ed following cumulus-corona removal. Oocytes were placed in Q1 (InVitrocare) after ICSI and cultured individually in this media until Day 3. Embryos were placed into CCM (VitroLife), on the morning of Day 3 for extended culture. Morphologic assessment occurred on Day 2, 3 5 and 6. The best embryos were identified and assisted hatched in the morning of day 3 - 2 to 3 hours prior to transfer. A minimum of 1 and maximum of 7 embryos were selected as best and AH'ed per patient. Non-hatched, non-transferred embryos along with AH'ed but non-transferred embryos were placed in extended culture and observed for blast formation. Blastocysts were cryopreserved on Day 5, 6 or 7. All transfers occurred on Day 3 using a Wallace 23cm stylet (Irvine) and Cook EchoTip Catheter (Cook OB/GYN) under abdominal guidance.

## Results

In the 84 cycles analyzed, 191 fresh embryos were AH and transferred (avg. 2.3 embryos/transfer), yielding a clinical implantation rate of 42% and ongoing PR of 67%. Among the remaining 602 NT embryos, 437 were non-AH, and 165 had day 3 AH. All NT embryos were observed until day 7. 61 of 165 (37%) AH embryos developed to blastocysts, whereas 130 of 437 (30%) of non-AH embryos yielded blastocysts, a statistically significant difference (Chi Square: p = 0.0019).



| Cycles w / Assisted Hatched / Non-Transferred Embryos | 84 |
|---|---|
| Total Embryos Produced | 793 |
| # Embryos Transferred | 191 |
| | |
| Total Embryos Undergoing AH | 356 |
| Assisted Hatched but Not Transferred | 165 |
| AH / not transferred / but frozen | 61 |
| % Blast Formation | 37% * |
| | |
| Not hatched / not transferred | 437 |
| Not hatched / not transferred / but frozen | 130 |
| % Blast Formation | 30% * |

\* p = (0.0019)

## Conclusions

AH on day 3 of non-transferred (NT) penultimate embryos — i.e. those remaining after fresh transfers — did not appear detrimental based on blastocyst formation rates. Interestingly, AH may have even been beneficial, based on a statistically higher blastocyst rate in the AH group compared to non-AH embryos. This effect could be due to: 1) Selection bias on NT embryos picked for AH 2) An intrinsic benefit of AH upon nutrient ion exchange or 3) A permissive effect leading to enhanced spatial relationships between dividing blastomeres. Prospective analysis is needed to better analyze these possibilities.



DEPOSITION
EXHIBIT
SanSonGie3
D6 4/21/05



# Contribution of Blastocyst Cryopreservation to Cumulative IVF Success

M. P. Portmann[1], L. T. SanSoucie[1], M. J. Tucker[1], H. C. Brown[1], B. A. McGirk[1], R. F. Feinberg[1,a].

[1] Reproductive Associates of Delaware, Newark, DE; [2] Georgia Reproductive Specialists, Atlanta, GA; [a] Yale Univ, New Haven, CT.

## Objective

Extended embryo culture to the blastocyst stage has shown promise for enhancing implantation rates while reducing the risk of multiple gestation in many patients. Nevertheless, universal acceptance of this strategy has not occurred. In order to evaluate the potential role of extended embryo culture in our center, we utilized blastocyst cryopreservation for non-transferred day 3 embryos, and have evaluated the impact of this approach upon implantation rates and cumulative success.

## Design

Retrospective analysis of 135 consecutive patient outcomes following embryo transfer with fresh and/or thawed blastocysts was assessed over a 24 month treatment interval. Survival and implantation competence of thawed blastocysts was determined.

## Materials and Method

Oocytes were initially placed into HTF (InVitrocare) after retrieval. If normally inseminated, oocyte remained in HTF until day 1 after retrieval after which they were placed into Q1 (InVitrocare) after fertilization assessment for culture until day 3. If injected, oocytes were placed into Q1 immediately following ICSI and cultured until day 3. On the morning of day 3, embryos were rinsed well and placed into CCM (VitroLife) for extended culture to Day 7. Morphologic assessment occurred on day 2, 3, 5 and day 6. Embryos were assisted hatched on day 3 prior to transfer. All transfers were carried out using a Wallace 23cm stylet and Cook Echotip ET catheter under abdominal ultrasound guidance.

## Materials and Method (cont.)

Blastocysts were frozen in two steps using modified HTF plus 20% HSA as the base medium: 5% Glycerol for 10 minutes followed by 10% Glycerol with 0.2M sucrose with immediate loading of embryos. Blastocysts were thawed stepwise through decreasing concentrations of glycerol and sucrose (10% Glyc + 0.4M Suc, 5% Glyc + 0.4M Suc, 2.5% Glyc + 0.4M Suc, 0.4M Suc, 0.2M Suc, 0.1M Suc, modified HTF) for 3 minutes each.

## Results

135 consecutive patients in this cohort (mean age; 34.4; range: 22-45) have undergone, as time of abstract submission, 156 transfers of fresh embryos (mean 2.8 embryos per transfer) and 29 transfers of thawed blastocysts (mean 2.7 blastocysts per transfer). Forty-three percent of the cohort (58/135) have had non-transferred embryos cryopreserved as blastocysts; of the 58 patients with blastocysts frozen, 25 patients accounted for 29 blastocyst thaw cycles. Survival and implantation competence of thawed blastocysts were calculated, along with the impact of these pregnancies on cumulative success in the patient cohort. (See Table). Fourteen percent of the cohort (19/135) have not achieved a pregnancy, but have unused cryopreserved blastocysts.



| | |
|---|---|
| # Blast Thaw Cycles | 29 |
| # Blasts Thawed | 103 |
| # Blast Survived | 84 |
| % Survival | 82% |
| Ongoing Thaw PR / Transfer | 45% (13/29) |
| Implant Rate / Thaw | 30% (24/79) |
| Ongoing Fresh PR / Transfer | 48% (74/156) |
| Implant Rate / Fresh | 28% (128/459) |
| Cumulative Clinical PR / Patient | 81%* (110/135) |
| Cumulative Ongoing PR / Patient | 66%* (89/135) |

*At time of abstract submission

## Conclusions

Extended culture and cryopreservation of non-transferred day 3 embryos has had a positive impact for patients in our center, by increasing the ongoing cumulative pregnancy rate in a consecutive cohort of patients. The majority of non-pregnant patients from this cohort remain in treatment. High blastocyst thaw survival rates have resulted in encouraging implantation and ongoing pregnancy rates for our center. Evaluating extended culture outcomes for non-transferred day 3 embryos provides an important quality assurance "stepping stone" for centers considering fresh blastocyst transfers.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

LYNN SANSOUCIE,                     :

            Plaintiff,                :

           v.                           :      C.A. No.  04-861-JJF

REPRODUCTIVE ASSOCIATES OF          :
DELAWARE, PA.                       :

            Defendant.                :

## AFFIDAVIT OF MARC PORTMANN, M.T., B.S., M. H. A.

STATE OF DELAWARE    :
                   :      SS.
NEW CASTLE COUNTY    :

BE IT REMEMBERED that on this 14th day of February, 2005, personally appeared before me the Subscriber, a Notary Public for the State and County aforesaid, MARC PORTMANN, who being duty sworn according to law, did depose and say as follows:

       1.      I am employed by Reproductive Associates of Delaware, P.A. ("RAD") as an Embryologist and Laboratory Manager.   I have personal knowledge of the facts stated below.

       2.      RAD provides medical care and fertility treatment for couples attempting pregnancy in a variety of infertility settings.  RAD employs approximately 20 employees, including two physicians and directors, Ronald Feinberg, M.D., and Barbara

1

B - 99

McGuirk, M.D., two embryologists, a laboratory specialist, two nurse practitioners, two medical assistants, patient coordinators, and additional staff.

3.     RAD offers its patients several different fertility treatments using assisted reproductive technology.    RAD also operates  three on-site laboratories:  the Andrology Laboratory for preparing and processing sperm, the Endocrine Laboratory for analyzing and quantitating hormone levels in the blood, and the *In-Vitro* Fertilization Laboratory ("IVF lab").

4.     The work performed in each lab is critical to the overall success of an assisted reproduction procedure.   An error  or misjudgment in one lab can be fatal to the entire procedure for couples waiting months, or even years, to attempt pregnancy through assisted reproduction technology.

5.     While the type of fertility treatment chosen by patients usually depends upon their particular diagnosis, the most commonly practiced methods at RAD are *Intrauterine Insemination* and *In-Vitro Fertilization.*

6.     *Intrauterine Insemination* ("IUI") is a type of artificial insemination which involves placing a sterile catheter containing sperm through the cervix and injecting the sperm directly into the uterus.   With IUI, the healthiest sperm are placed into the female genital tract to increase the likelihood that one of the sperm will fertilize an egg.   IUI is therefore very helpful for patients experiencing low sperm count or motility.   IUI is less invasive than *in-vitro* fertilization, however, it does not allow the physician to view whether fertilization is capable of taking place.   With *in-vitro* fertilization, fertilization can be confirmed because it takes place outside of the body.

7.     *In-Vitro* Fertilization ("IVF") generally involves retrieving

B - 100

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LYNN SANSOUCIE, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 04-861-JJF |
| | ) | |
| v. | ) | JURY TRIAL DEMANDED |
| | ) | |
| REPRODUCTIVE ASSOCIATES | ) | |
| OF DELAWARE, P.A., | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that on March 14, 2005, I electronically filed **APPENDIX TO DEFENDANT REPRODUCTIVE ASSOCIATES OF DELAWARE, P.A.'S ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

Jeffrey K. Martin, Esquire
Margolis & Edelstein
1509 Gilpin Avenue
Wilmington, DE 19806


David H. Williams (#616)
Jennifer L. Brierley (#4075)
MORRIS, JAMES, HITCHENS & WILLIAMS, LLP
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900
dwilliams@morrisjames.com
Attorneys for Defendant
Dated: March 14, 2005       Reproductive Associates of Delaware, P.A.

DHW/016459-0003/1096105/1