IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LYNN SANSOUCIE,

    Plaintiff,

v.

REPRODUCTIVE ASSOCIATES
OF DELAWARE, P.A.

    Defendant.

C.A. No. 04-861-JJF

JURY TRIAL DEMANDED

### AFFIDAVIT OF LYNN SANSOUCIE

STATE OF _____

COUNTY OF _____

SS.

I, Lynn SanSoucie, having been duly sworn, depose and say as follows:

1. I was employed by Reproductive Associates of Delaware, P.A. ("RAD"). I have personal knowledge of the facts stated below.

2. I am a certified medical lab technician; not a certified medical technologist.

3. I am two (2) courses, not two (2) credits, short of completing my Bachelor of Science degree in Healthcare Administration.

4. The full-time position with RAD that was offered to me was that of an embryologist-in-training.

5. I did not determine when a patient was ready for an egg retrieval or artificial insemination. I merely followed standard operating procedures established by RAD which did not require discretion or independent judgment on my behalf.

TAB 1

A-1

6. I worked at RAD performing semen analysis, sperm processing, and endocrine analysis. This work does not require an advanced degree; moreover, a medical assistant or lab technician can perform these tasks.

7. I never mentioned or raised the issue of overtime compensation because of my fear of retaliatory treatment from Marc Portmann.

8. I believe the work at RAD required more than one embryologist because Marc Portmann made things more difficult than they needed to be. I did not have any experience in this area and did not know any better at the time.

9. I never assessed when a patient was ready for an egg retrieval or artificial insemination; instead, the medical doctors and registered nurses used their discretion and judgment to make those decisions.

10. Phlebotomy does not require an advanced degree or specialized training.

11. The work and tasks I performed in the Endocrine Lab were pursuant to standard operating procedures at RAD and did not require the use of discretion or independent judgment on my part.

12. Results from tests performed were generated by a computer program.

13. The work and tasks I performed in the Andrology Lab were pursuant to standard operating procedures at RAD and did not require the use of discretion or independent judgment on my part.

14. I did work closely with Marc Portmann. This was because Marc always watched and monitored me, thereby never allowing me to exercise discretion or independent judgment.

15. I never performed a search for eggs alone. The times I was involved in this procedure, Marc Portmann closely monitored and guided me.

16. I was still learning the ICSI process and, as a result, I never injected sperm into an egg without guidance from my supervisor.

17. I never performed the ICSI process alone. I always received guidance from my supervisor.

18. In order to determine what embryos were properly developing, I followed a standard operating procedure and did not use discretion or independent judgment.

19. I attended a week-long training seminar in June 2001 at the Jones Institute for Reproductive Medicine in Norfolk, VA. My attendance at this training was a prerequisite to acceptance of the full-time position at RAD because my previous employer had already paid for my attendance. I felt that it was necessary for RAD to pay for my attendance since I was leaving my previous employer.

20. I never trained under Michael Tucker, Ph.D. I only observed Dr. Tucker on one occasion.

21. I visited Dr. Tucker's IVF Center in Shady Grove, Georgia for a one-time on-site observation. I did not receive any training.

22. My contribution to the scientific works presented by RAD at national conferences was limited to looking up specific charts and data as requested by Defendant. My involvement did not include any scientific writing, even though my name did appear on the finished product as a courtesy.

23. I always had to ask Marc Portmann what time I needed to be in the lab each day. I did not have the option of making my own work hours or schedule.

24. I was not involved in the interview process of Dawn Printz or Linda Morrison. Marc Portmann interviewed both potential candidates who are currently employed by RAD.

25. I was advised in February 2004 that I was going to be fired. However, I had already made the decision to terminate my employment relationship with RAD.

26. My resume was never submitted to my current employer. Therefore, it was not used in the decision to offer me my current position.

27. My current position is similar to the work I was performing at RAD and I currently receive overtime compensation for hours worked in excess of 40 hours per week.

LYNN SANSOUCIE

SWORN TO AND SUBSCRIBED before me, a Notary Public, for the State and County aforesaid, this ___14___ day of March, 2005.

_____
NOTARY PUBLIC

JACQUELINE GARRETT
Notary Public
State of New Jersey
My Appointment Expires 06/08/2009

